# UNION PACIFIC RAILWAY COMPANY v. GOODRIDGE.

**ERROR TO THE CIRCUIT COURT OF THE UNITED STATES FOR THE DISTRICT OF COLORADO.**

No. 211. Argued April 14, 17, 1893. — Decided May 15, 1893.

It is no proper business of a railway company as common carrier to foster particular enterprises or to build up new industries; but, deriving its franchises from the legislature, and depending upon the will of the people for its very existence, it is bound to deal fairly with the public, to extend them reasonable facilities for the transportation of their persons and property, and to put all its patrons upon an absolute equality.

It is no defence to an action against a railway company under the statute of Colorado of 1885 to recover triple damages for an unjust discrimination in freights, to set up a contract for a rebate in case of furnishing a certain amount for transportation, without also alleging and showing that such an amount was furnished.

An unexplained, indefinite and unadjusted claim for damages arising from a tort, which though put forward had never been pressed, is no defence in such an action.

Sundry objections to testimony are held to be without merit.

THIS was an action at law by the firm of Goodridge & Marfell, coal merchants, carrying on the business of mining coal at Erie, Colorado, and of selling the same at Denver, against the Union Pacific Railway Company, to recover triple damages, under a statute of Colorado, for an alleged unjust discrimination in freights upon coal from Erie to Denver.

The statute which was the basis of this action, together with a corresponding clause of the state constitution of Colorado, so far as the same are material to this case, are set forth in the margin.[1]

---

[1] Constitution, Art. XV, Sec. 6: " All individuals, associations, and corporations shall have equal rights to have persons and property transported over any railroad in this State, and no undue or unreasonable discrimination shall be made in charges or in facilities for transportation of freight or

Statement of the Case.

The amended complaint alleged the defendant to be a common carrier, chartered by an act of Congress, and operating a line of railroad from Erie and Marshall, at both of which were located certain coal mines, about thirty-five miles, to Denver; that, if there were any difference in distance, it was in .favor of Erie by about two miles, and that the published

passengers within the State, and no railroad company, nor any lessee, manager, or employé thereof, shall give any preference to individuals, associations, or corporations in furnishing cars or motive power."

Session Laws of Colorado, 1885, page 309 : " Sec. 7. (Unjust discrimination.) No railroad corporation, shall, without the written approval of said commissioner, charge, demand or receive from any person, company or corporation, for the transportation of persons or property, or for any other service, a greater sum than it shall, while operating under the classification and schedule then in force, charge, demand or receive from any other person, company or corporation for a like service from the same place, or upon like conditions and under similar circumstances, and all concessions of rates, drawbacks and contracts for special rates shall be open to, and allowed all persons, companies and corporations alike, at the same rate per ton per mile, upon like conditions and under similar circumstances, except in special cases designed to promote the development of the resources of this State, when the approval of said commissioner shall be obtained in writing," &c.

" Sec. 8. (Extortion.) No railroad corporation shall charge, demand or receive from any person, company or corporation an unreasonable price for the transportation of persons or property, or for the handling or storing of freight, or for the use of its cars, or for any privilege or service afforded by it in the transaction of its business as a railroad corporation and not specified in the classification and schedule prepared and published by such railroad corporation. The superintendent or other chief executive officer of each railroad in this State, shall cause to be kept posted up, in a conspicuous place in the passenger depot in each station where passenger tickets are kept for sale, a printed copy of the classification and schedule of rates of freight charges then in force on each railroad, for the use of the patrons of the road. Any railroad company violating any of the provisions of this section shall be deemed guilty of extortion, and be subject to the penalties hereinafter described."

" Sec. 9. (Penalty.) Any railroad corporation that shall violate any of the provisions of this act as to loading points, freight cars, unjust discrimination or extortion, shall forfeit, in every such case, to the person, company or corporation aggrieved thereby, three times the actual damage sustained or overcharges paid by the party aggrieved, which triple damages shall be adjudged to be paid, together with the costs of suit and a reasonable attorney's fee, to be fixed by the court and taxed with the costs."

schedule of freights for coal was the same, namely, one dollar per ton from each place; that plaintiffs, while operating their coal mines from Erie, between October 31, 1885, and August 12, 1887, shipped to Denver 12,960 tons and 1625 pounds of coal, for which they paid defendant $12,960, and a fraction, being at the rate of one dollar a ton, believing that such was the regular schedule rate charged the general public and all parties similarly situated for such service, there being no difference or discrimination between such rates as between Erie and Marshall to Denver; that the Marshall Consolidated Coal Mining Company at the same time operated coal mines at Marshall, and was engaged in shipping coal over defendant's road to Denver under the same circumstances as the plaintiffs, except as to rates, and was a competitor with the plaintiffs; that the amount of such shipments was about 145,833 tons, the defendant charging such company sixty cents per ton, and allowing a rebate of forty cents from its schedule rates; that plaintiffs are informed such rebates amounted to upwards of $58,000, and that the defendant in this manner, without the approval of the railroad commissioner, demanded and received from the plaintiffs the sum of $5184.30 more than it received from the Marshall Consolidated Coal Mining Company, (hereinafter called the Marshall Company,) for like services, upon like conditions and under similar circumstances, without the knowledge or consent of the plaintiffs; that the defendant in this manner and to this extent allowed the Marshall Company drawbacks or rebates for carrying its coal which were not open to and allowed all companies and corporations alike, at the same rate per ton per mile; that these rebates were made secretly and clandestinely in favor of the Marshall Company, with the design to deceive and mislead the plaintiffs and fraudulently conceal from them the facts relating to such rebates, and did so conceal them until about August 12, 1887; and that the plaintiffs were mislead and deceived by these devices and practices, and remained in ignorance of the same until such date.

The plaintiffs further alleged that defendant had granted other parties similarly situated the same rebates for the

carrying of coal over its road from Marshall, and further charged that all the coal shipped by the plaintiffs and the Marshall Company was about the same quality, and cost the defendant the same amount to handle and ship over its lines, and that the charges made by the defendant were unreasonable, unjust, and extortionate; that plaintiffs had demanded of defendant reimbursement of the overcharges which had been refused, by reason of which they asked judgment in the sum of $15,552.90, being three times the amount alleged to have been extorted, at the rate of forty cents per ton on all coal shipped by them.

The answer set up a general denial of each and every material allegation in the complaint, and special denials that defendant had allowed the Marshall Company a rebate of forty cents per ton, or that it had charged plaintiffs more than it had charged the Marshall Company for like services. For a second defence, the defendant alleged that in January, 1880, the Denver, Western and Pacific Railway Company, a Colorado corporation, was engaged in building a railroad from Denver to Boulder, and in so doing passed over certain coal lands belonging to one Langford and others, known as the Marshall coal mine; that in constructing its line it negligently broke into the mine, in consequence of which it was claimed the mine took fire and destroyed large amounts of coal, and continued to burn for several months, to recover which damages suits were instituted by the owners of the mine against the railroad company, which were litigated for several years; that, in addition to such damages, the company had failed to obtain a right of way across the mining lands; that in January, 1882, a judgment was also obtained against the company in the sum of $64,000 upon a mechanics' lien, of which judgment the Union Pacific subsequently became the owner, as well as of a large number of the bonds of the said company; that the road was subsequently sold and came into the hands of the Union Pacific, and, in 1885, a corporation was formed under the name of Denver, Marshall and Boulder Railway Company, which was owned and controlled by the Union Pacific, and which proceeded to construct its road from

Denver to Boulder, and that the claim against the Denver, Western and Pacific had become and still remained a lien upon the property in the hands of the Denver, Marshall and Boulder Company. That, in 1885, the said Langford and others sold the Marshall coal mine to the Marshall Company, which thus became the owner of the mine, and also, by assignment, the owner of the claim for damages done to it by the Denver, Western and Pacific Railway Company; that, in 1885, the Union Pacific was the owner of a certain coal mine at or near Louisville, Boulder County; that, in addition to the liens above stated, there was also a bonded indebtedness of about one million dollars upon the Denver, Western and Pacific, secured by a mortgage, which was foreclosed in 1883, and upon such foreclosure the owners of the Marshall coal mine answered, setting up their claim for damages to the extent of $81,000. That the property was subsequently put up and sold at master's sale under decree of foreclosure, the rights of Langford and others not being adjudicated at that time, and that upon such sale the title was acquired by parties acting in behalf of the Union Pacific, which had become the owner of a large number of the mortgage bonds. That for some time prior to October 13, 1885, defendant was receiving coal for its locomotives from the Union Coal Mining Company, which was the owner or lessee of certain coal mines at Erie and at Louisville, and had been engaged in working the mines and furnishing the defendant with coal; that about the same time the Marshall Company had become the owner of the coal lands formerly owned by Langford and others, and that on account of complaints that had been made by the owners of other mines, the defendant concluded that it was for its best interest to discontinue its connection with the Union Coal Company, and for that purpose it entered into negotiations with the Marshall Company for the purpose of inducing this company to take off its hands the mines of the Union Coal Company. That it was further induced to enter into this contract by the fact that the Marshall Company had succeeded to the rights of the former owners of the Marshall coal mines, and to their claim for damages against the Denver,

Western and Pacific, and for the purpose of getting rid of the operation of the Union coal mines, and of settling this claim for damages, it entered into a contract with the Marshall Company on the 13th day of October, 1885, in which it was recited that, it being for the interest of the Union Pacific to discontinue the working of the Union coal mine, and to contract with the Marshall Company for all the coal needed for its own consumption on its road and branches, not to exceed fifty thousand tons for the first year and one hundred thousand tons for every year thereafter, therefore, in consideration of the Union Coal Company going out of the coal business, and the purchase from the Marshall Company by the defendant of the coal used for its own consumption, at the rate mentioned therein, and in consideration of the rates for the transportation of coal therein agreed upon, the coal company agreed to furnish from the Marshall mine all coal ordered by the railway company for its own use and consumption, and the use of its branches, not exceeding fifty thousand tons the first year and one hundred thousand tons per annum thereafter, and to deliver all coal on board of the cars of the Union Pacific at the mouth of the mine, at a price not to exceed $1.25 per ton, delivered and loaded on the cars, and if such cost was less than $1.25 per ton, then at actual cost.

It was further agreed that the defendant should give to the Marshall Company for the transportation of its coal the regular tariff rate, not exceeding one dollar per ton, unless two hundred thousand tons should be mined and furnished for transportation yearly, in which case a rate of sixty cents per ton should be paid for all coal transported over defendant's line to Denver, and if the rate were reduced below one dollar, then the sixty cent rate should be reduced in the same proportion. It was also provided that, if the railway company should order coal in excess of the amounts of fifty thousand and one hundred thousand tons per annum, then the railroad company should pay the cost of mining and putting such coal on the cars plus fifty cents per ton, except that in no case should the price for mining and loading such coal exceed $1.40 per ton; and it was further agreed that, as

part consideration of the contract, the majority of the capital stock of such coal company should for two years be held in case the company desired to sell it, and should first be offered to the Union Pacific in preference to any other purchaser. This contract was to remain in force for five years.

It was further alleged that, from the fact that Mr. Adams, the president of the defendant company, was not intimately acquainted with the claim for damages made by the former owners of the Marshall mines, the contract failed to mention anything about the settlement of said claim, but that the contract was sent to the general attorney of the defendant, with instructions to look it over, and if anything further was needed to settle the controversy that might grow out of anything theretofore existing it should be provided for in a separate instrument, and thereupon the attorney prepared a bond of indemnity for execution by the coal company, reciting the claim for damages against the Denver, Western and Pacific, and agreeing to indemnify the railway company against any damages which might accrue to it by reason of such claim, and upon the execution of such bond, and as part of the transaction, the contract was delivered to the Marshall Company, and afterwards the former owners of said Marshall mines executed and delivered a receipt in full, discharging the defendant from all suits and causes of action existing by reason of any matter or thing pertaining to the construction of the Denver, Western and Pacific Railway Company. The answer further alleged that the defendant was informed and believed that it cost the Marshall Company, and would have cost the defendant if it had continued to operate through the Union Coal Company, at least $1.60 per ton to mine their coal, and that, on account of the settlement of the aforesaid claims, and of the coal necessarily used by it, the Marshall Company has paid the defendant a higher rate as a matter of fact than one dollar per ton, although it was not intended that the rate should exceed the schedule price.

To this second defence, which was elaborately set forth in the answer, a demurrer was interposed by the plaintiffs,

and sustained by the court, (37 Fed. Rep. 182,) to which the defendant duly excepted. Defendant thereupon for a third defence pleaded the statute of limitations, plaintiffs replied, and the case went to trial before a jury, which returned a verdict for the plaintiffs in the sum of $5184.30, for which amount judgment was entered, and defendant sued out this writ of error.

*Mr. John F. Dillon*, (with whom were *Mr. Harry Hubbard, Mr. Willard Teller, Mr. H. M. Orahood* and *Mr. E. B. Morgan* on the briefs,) and *Mr. J. M. Wilson* for plaintiff in error.

*Mr. C. S. Thomas*, (with whom was *Mr. W. H. Bryant* on the brief,) for defendants in error.

*Mr. Byron Millett* and *Mr. A. J. Sampson* filed a brief for defendants in error.

MR. JUSTICE BROWN, after stating the case, delivered the opinion of the court.

This case involves the construction of an act of the legislature of Colorado passed in 1885, prohibiting railroads from charging one person or corporation a greater sum than it charges any other, for a like service upon like conditions and under similar circumstances. The statute is of the same nature as the Interstate Commerce Act, and like that was designed to prevent unjust discrimination and extortion in rates for the carriage of persons and property.

1. The first assignment of error is taken to the ruling of the court sustaining the demurrer to the second answer of the defendant, in which it set up certain contracts with the Marshall Consolidated Coal Company, which were claimed to justify the rebate of forty cents per ton allowed to that company from the regular schedule rates, which the plaintiffs were compelled to pay. This defence set forth a very complicated series of facts, which, however, are susceptible of a condensed statement. It seems that the defendant, the Union

Pacific, was the owner of a large part of the capital stock of the Union Coal Company, and had been for some time receiving from it coal for consumption upon its locomotives, when, on account of certain complaints made by the owners of other mines, it concluded that it was for its best interests to discontinue its connection with this company, and to enter into negotiations with the Marshall Company for its supply of coal. These negotiations resulted in the contract of October 13, 1885, wherein the coal company agreed on its part, *first,* to furnish the railroad with all coal needed for its consumption, not exceeding fifty thousand tons the first year and one hundred thousand tons yearly thereafter, and to deliver the same on its cars at the mouth of the mine at cost, but in no case to exceed $1.25 per ton ; *second,* that, in case the railroad should order in excess of the above amount, the same should be furnished at cost, plus fifty cents per ton, but in no case should such cost exceed $1.40 per ton ; *third,* that the railroad company should have the option for two years of taking a majority of the capital stock of the coal company in preference to any other purchaser, should the coal company desire to sell the same.

The railway company, upon its part, agreed to go out of the business of mining coal, and to give the coal company the regular tariff rate to Denver of $1 per ton, *unless two hundred thousand tons were furnished for transportation each year,* in which case a rebate of forty cents should be given, with a corresponding reduction in case the regular tariff was reduced below $1.

There were other subordinate covenants upon both sides, but they are not material to the consideration of this case. This contract was to remain in force for five years.

It is a sufficient reply to the whole defence set up in this part of the answer to say that the coal company was only to be allowed a rebate of forty cents per ton in case it furnished the railroad company two hundred thousand tons per year for transportation, and there is no allegation in the answer that it ever did furnish this amount, or ever became entitled to the rebate. The want of such allegation is fatal to the contract

as a defence, and the court for this reason, if for no other, was right in sustaining the demurrer.

But we think the answer must be held insufficient for another reason.    It is further stated that an additional consideration existed for this rebate in certain unliquidated claims for damages which the former owners of the Marshall mines had against the Denver, Western and Pacific Railway Company, the original constructors of the road, by reason of their negligently breaking into the mine during the construction of the road, setting it on fire, and thereby consuming a large amount of coal and personal property, for which claim suits were instituted against the railway company and litigated at great expense for several years, and were still undetermined. There was also another claim for a right of way for one mile across their lands.    These claims, Langford and others, who then owned the mine, sold and assigned to the Marshall Company with the property.    The Denver, Western and Pacific Railway, which had done the injury for which the damages were claimed, was itself sold under foreclosure of its mortgage, and bought in by parties acting in the interest of the Union Pacific, who organized a new corporation, called the Denver, Marshall and Boulder Railway, leaving the claim of the Marshall Coal Company unadjusted and unpaid, and a lien upon the property.    How this claim for unliquidated damages for the negligence of the railroad company became a lien upon the property of the company, and how such lien took precedence of the mortgage and survived the foreclosure and sale of the property, and became a lien upon the road in the hands of the Denver, Marshall and Boulder Company, does not clearly appear, but admitting it to be still valid and outstanding, as alleged in the answer, the question still remains whether the defendant company can set up an unliquidated claim of this kind in defence of a rebate of forty cents per ton allowed the coal company over every other shipper on its road.

It will be observed in this connection that not only was the amount of the damages suffered by the coal company never fixed, agreed upon, or adjusted, but the amount of coal which

the Marshall Company was at liberty to deliver to the railroad company for transportation was left equally indefinite, save only that it must exceed two hundred thousand tons per year to entitle it to the rebate.    This contract was to remain in force five years; but upon the theory of the defendant there was nothing to prevent it being continued indefinitely, provided the defendant company was willing to accede to any amount of damages which the coal company might see fit to claim.    While we do not undertake to say that a railroad company may not justify a fixed rebate in favor of a particular shipper by showing a liquidated indebtedness to such shipper, which the allowance of the rebate was intended to settle, it would practically emasculate the law of its most healthful feature, to permit an unexplained, indefinite, and unadjusted claim for damages arising from a tort, which, though litigated for some time, never seems to have been prosecuted to a final determination in the courts, to be put forward as an excuse for a clear discrimination in rates. This act was intended to apply to intrastate traffic the same wholesome rules and regulations which Congress two years thereafter applied to commerce between the States, and to cut up by the roots the entire system of rebates and discriminations in favor of particular localities, special enterprises, or favored corporations, and to put all shippers on an absolute equality, saving only a power, not in the railroad company itself, but in the railroad commissioner, to except "special cases designed to promote the development of the resources of this State," and not to prevent the commissioner "from making a lower rate per ton per mile, in carload lots, than shall govern shipments in less quantities than carload lots, and from making lower rates for lots of less than five carloads than for single carload lots."    The statute recognizes the fact that it is no proper business of a common carrier to foster particular enterprises or to build up new industries; but, deriving its franchise from the legislature, and depending upon the will of the people for its very existence, it is bound to deal fairly with the public, to extend them reasonable facilities for the transportation of their persons and property, and to put all its

patrons upon an absolute equality. *Scofield* v. *Railway*, 43 Ohio St. 571; *Sanford* v. *Railroad*, 24 Penn. St. 378; *Messenger* v. *Pennsylvania Railroad*, 7 Vroom, (36 N. J. Law,) 407; *McDuffie* v. *Portland &c. Railroad*, 52 N. H. 430. So opposed is the policy of the act to secret rebates of this description, that it requires a printed copy of the classification and schedule of rates to be posted conspicuously in each passenger station for the use of the patrons of the road, that every one may be apprised, not only of what the company will exact of him for a particular service, but what it exacts of every one else for the same service, so that in fixing his own prices he may know precisely with what he has to compete. To hold a defence thus pleaded to be valid would open the door to the grossest frauds upon the law, and practically enable the railroad company to avail itself of any consideration for a rebate which it considers sufficient, and to agree with the favored customer upon some fabricated claim for damages, which it would be difficult, if not impossible, to disprove. For instance, under the defence made by this company, there is nothing to prevent a customer of the road, who has received a personal injury, from making a claim against the road for any amount he chooses, and in consideration thereof, and of shipping all his goods by that road, receiving a rebate for all goods he may ship over the road for an indefinite time in the future. It is almost needless to say that such a contract could not be supported.

There is no doubt of the general proposition that the release of an unliquidated claim for damages is a good consideration for a promise, as between the parties, and if no one else were interested in the transaction, that rule might apply here; but the legislature, upon grounds of public policy, and for the protection of third parties, has made certain requirements with regard to equality of rates, which in their practical application would be rendered nugatory, if this rule were given full effect. For this reason we think the railroad company is in error in its assumption that " if, in the honest judgment of the officers of the defendant company, who made the contract, the considerations which entered into it, and upon which alone it was

made, were sufficient to warrant the company to pay back to the Marshall Company forty cents per ton for each ton it shipped for five years, that is enough." This is but a restatement in different language of a comment made by the court below in its opinion, that " the whole answer amounts only to this: That the Marshall Company is allowed less rates than other shippers are required to pay upon considerations which are satisfactory to defendant; and it is obvious that this is no answer to a complaint of unlawful discrimination." If reasons of public policy dictate that the schedule rates shall be posted conspicuously in each railway station, it is no less important that the customers of the road should have the means of ascertaining whether any departure from such rates in favor of a particular shipper is justified by the facts. Such a method is contemplated by the act, in providing that no discrimination of this kind shall be made without the written approval of the railway commissioner. It was evidently designed to put it in the power of the commissioner to permit such discrimination to be made, possibly in a case like the present one, if, in his opinion, the circumstances seem to warrant it.

2. The second assignment of error is taken to the admission of certain letters of Taggart and Kimball.

Upon the trial of the case before a jury, the plaintiffs gave evidence tending to show that the Jackson Coal Company was operating mines at Canfield, thirty-six miles from Denver, and was charged by defendant $1 per ton for transportation, and that another railroad company, which ran across the mine, charged the same rate. There was also testimony showing the amount shipped by plaintiffs over defendant's road to have been 12,961 tons, for which they paid $1 per ton. Plaintiffs thereupon called E. R. Taggart, who resided in Denver, and had been engaged in the coal trade for several years, selling the product of the Fox Coal Company, which shipped its coal at the same station as the Marshall Company, and was charged $1, and who testified that upon information received by him of the rebate allowed to the Marshall Company through the proceedings of a commission appointed to

investigate the affair, he wrote to the president of the defendant, and also to T. L. Kimball, the general traffic manager and official head of the defendant company. The letter to Kimball, with the reply, was objected to upon the ground that the demurrer to the second answer having been sustained, any statement of the way in which the defendant acted relating to that defence was immaterial, irrelevant, and incompetent, which objection was overruled, and defendant excepted. The letter from Kimball to the witness Taggart purported to be a reply to a letter from Taggart to the president of the road, and stated generally that the contract with the Marshall Company was made under circumstances entirely dissimilar to those existing between the Fox Company and the Union Pacific, and in consideration of the company's furnishing the railroad coal for its own use at not exceeding $1.25 per ton, and also in compromise and settlement of a claim against the company for some sixty-odd thousand dollars. Taggart's reply thereto, dated August 20, 1887, stated the claim from his standpoint, and that he had been advised by the very highest legal sources that the contract was without warrant and clearly in violation of law, and further insisted upon his claim for the repayment of forty cents per ton. If there were any objection to the admission of Kimball's letter upon the ground that the letter to which it was a reply was not produced, that objection was met by the production of that letter upon cross-examination — a letter which appears to have been written July 25, 1887, to Mr. Adams, president of the road, at Boston. The witness stood in the same position as the plaintiffs with respect to defendant, and had also brought suit against it to recover the same rebate which had been allowed to the Marshall Company, and which plaintiffs were suing to recover in this case. Assuming the correspondence to have been between different parties, and therefore irrelevant, it is not easy to perceive how it could have prejudiced the defendant, as Kimball's letter was a mere iteration of the defence set up in the answer, and put forward at the trial, and Taggart's reply thereto, if irrelevant, was not improper or prejudicial to the defendant. If the witness had had an oral

conversation with Mr. Kimball, the manager of the defendant company, there can be no doubt that such conversation, and the whole of it, would have been admissible, as both Taggart's claim and defendant's stood precisely upon the same footing, and if this demand and refusal, instead of being oral, was by correspondence, it would seem equally admissible. As Kimball's letter stated clearly the position of the defendant with regard to both these claims, it is difficult to see how it could be prejudiced by its production.

3. The third, fourth, and fifth assignments of error are taken upon the same ground to the action of the court in refusing to allow the witnesses Taggart and Rubridge to testify as to what it cost to get out coal and put in on the cars at the Marshall mine, and in ruling out testimony showing that by reason of such cost the Marshall Company actually paid at least $1 per ton for coal carried by defendant.

At the time witness Taggart was asked this question, the case stood in this position : A demurrer to the second answer of the defendant setting up its excuses for the rebate had been sustained, and the case set for trial upon the complaint and the denials — in other words, upon the general issue. Plaintiffs had shown that they, as well as the Jackson and Fox Coal Company, had paid $1 per ton, and had shown the rebate paid to the Marshall Company, but the contract had not been put in evidence, though the witness Taggart had sworn that he knew " that defendant set up in bar of plaintiffs' claim a contract they had with the Marshall Company in consideration of the Marshall Company supplying them with coal at a given price — much below the price at which they could mine it or get it out of the mines — and, further, in settlement of an old law suit they had ; " and the record then states in a very blind way that " the witness gave further testimony showing that Kimball's testimony as to its own uses and not exceeding $1.25 per ton, which was then costing plaintiffs and others about $1.50 to mine, and commercial coal at not exceeding $1.40 per ton, at a time when other producers asked $1.60 per ton — that was making a difference of from twenty to twenty-five cents per ton on

every ton of coal than what it cost." Defendant's counsel here asked : " As a matter of fact, do you know what it did cost to get out a ton of coal and put it on cars at the Marshall or Fox mine ?" This was clearly immaterial, as it was no excuse for a rebate that the coal cost more or less. The right of a railroad to charge a certain sum for freight does not depend at all upon the fact whether its customers are making or losing by their business.

The next witness, Robert H. Rubridge, who had been the treasurer and assistant secretary of the Marshall Company, testified that from November 1, 1885, to August 1, 1887, there was shipped from the Marshall mine to Denver 67,863 tons, upon which a rebate of forty cents per ton was allowed. Upon cross-examination he testified that that rebate was allowed in consideration " of our giving an indemnity bond. Our company gave an indemnity bond protecting the Union Pacific from all claims on account of a damage suit against them, amounting to about $65,000, for which they had attachments on some of the rolling stock and ties and half a mile of track of the Denver, Western and Pacific. . . . We were to give them coal at cost for the company's use, but not to exceed at any time $1.25 per ton, and also to give them coal for commercial use at not exceeding $1.40 per ton, that is, for Kansas but not for Denver." This oral testimony with regard to the contract was objected to by plaintiffs' counsel on the ground that the written contract should be produced, an objection which was overruled by the court. There was evidently an attempt here to obtain from the witness a statement of so much of the contract as was favorable to the defendant, and at the same time not to put it in evidence, since the contract would show on its face that the coal company was not entitled to any rebate, unless it furnished the railroad company two hundred thousand tons per annum for transportation, a far larger amount than it did actually furnish. It further appeared that the contract, establishing the price of the coal, was not lived up to, as the railroad company was paying anywhere from $1.25 to $1.75 per ton. The witness was then asked how much it cost to get

out coal, and to put it on the cars for the use of the Union Pacific in its engines, and also for its commercial use in Kansas.

The answer to this question, as well as the proposal of the defendant to show by the witness that the cost of getting out the coal, which they were obliged to furnish the Union Pacific under the contract, was largely in excess of what they got, was properly ruled out. The relations between the defendant and the Marshall Company were fixed by their written contract, and under that contract the railway company was entitled to a certain amount of coal at $1.25 per ton regardless of cost, and the Marshall Company was not entitled to a rebate unless they furnished 200,000 tons per annum for shipment. This testimony could only have been offered to show that the company was losing money in furnishing the coal at $1.25 per ton, and, therefore, that the discrimination in their favor by the railroad company was not unjust. But the court, having sustained the demurrer to the answer setting up this contract upon the ground that it constituted no defence, could not consistently have permitted the defendant to introduce oral testimony of such contract for the purpose of enabling it to rely upon such stipulations as were thought to be favorable to itself. The witness had stated, in answer to the question why the rebate of 40 cents per ton was allowed, that the consideration for doing this was in writing. Plaintiffs' counsel thereupon objected to the proposed oral evidence of the contract as incompetent, and while this objection, though it seems to us to have been well taken, was not sustained, and the witness was permitted to give certain of its stipulations, the court was at liberty at any time to put a stop to this character of testimony, or to rule out any further questions based upon it. The whole case virtually turned upon the demurrer to that portion of the answer setting up this contract. This demurrer having been sustained, the defendant should not have been allowed in this indirect way to obtain the advantage of certain stipulations included in the contract.

4. The sixth assignment, that the court erred in refusing to

receive in evidence the release of the Marshall Company to the defendant company, cannot be sustained for the same reason. This release, a copy of which is given in the record, was given by the Marshall Coal Mining Company, and by Langford and Marshall, the previous owners of the mine, to the defendant railway company, releasing it from " all actions and causes of action, suits, controversies, claims, and demands whatsoever for or by reason of any cause, matter, or thing arising out of the construction of any railroad across the property of either of us in Boulder and Jefferson Counties, Colorado." It is obvious, upon the principles hereinbefore stated, that this release was altogether too vague and general to serve as a basis for making the rebate to the Marshall Company.

After some other testimony as to prices paid by other companies, and of unsuccessful efforts made to ascertain why the Marshall Company was given lower rates than its competitors, the plaintiffs rested. The defendant put in no testimony, and the case was committed to the jury, who returned a verdict for $5481.34.

5. The seventh and last assignment of error was to the action of the court in refusing to grant a new trial, and in entering a judgment on the verdict, because there was no sufficient evidence to support the verdict, and especially to sustain it as to the amount of damages. Plaintiffs' evidence had shown that the Marshall Company had been receiving a rebate upon all coal transported by it to Denver, which was not allowed to its competitors in business, and the damages sustained by the plaintiffs were measured by the amount of such rebate, which should have been allowed to them. The question whether they lost profits upon the sale of their coal by reason of the non-allowance of such rebates was too remote to be made an element of their damages. They were entitled to the same terms which the Marshall Company would have received, and damages to the exact extent to which the Marshall Company was given a preference.

There was no error in the action of the court below, and its judgment is, therefore,

*Affirmed.*