## Crescent Coal Co. v. L. & N. R. R. Co.

(Decided March 18, 1911.)

## Appeal from Henderson Circuit Court.

1. Railroads as Common Carriers—Duties of.—In the discharge of its duties to the public as a common carrier, a railroad must use for the public convenience all the tracks set apart by it for the transportation of freight, and treat without favor or discrimination all persons offering to it freight for carriage.

2. Same.—A common carrier may hold itself out to the public as being a carrier of certain articles; and if it is only engaged in the carriage of the specified articles, it is not under any obligation to carry other things.

3. Same.—No length of time or manner of treatment or habit of dealing will discharge a common carrier when requested from the obligation to furnish to the public the service it is engaged in performing.

4. "Yards and Terminals."—A railroad company may for its convenience in the handling, storing and distribution of its cars and freight, have yard facilities including switches, spurs and side tracks, and it will not be obliged as a common carrier to transport from one point to another in such yards freight for the convenience of shippers.

5. Spur Tracks to Industrial Establishments.—A railroad company owes to establishments connected with its line of road by spur tracks the same duty that it does to establishments situated immediately upon its main line of road. It is under the same obligation to furnish facilities for the transportation to one as it is to the other. It must serve all alike.

7. Yards or Switching Limits—Limitation Upon Right to Establish.—A railroad can not arbitrarily and without any relation to the use to which it is put, designate a part of its track or system as yards or switching limits, and assert that it owes no duty as a carrier in this district except such as it may choose to assume. It can not classify or divide its trackage into parts and say that on one part it is a carrier and on another it is not.

8. Rates Carrier May Charge.—When a carrier publishes a rate it will charge for a certain service, it must furnish to all persons demanding this service the same rate.

9. Same.—If a carrier has no established rate that covers the service requested, it must fix a reasonable rate for such service.

10. Classification of Freight.—A carrier has the right to classify freight and makes a reasonable difference in its charges for different kinds of freight.

11. Measure of Damage for Failure of Carrier to Haul Freight at Its Established Rate.—A person sustaining loss by the failure of a carrier to transport freight tendered to it at its stipulated rate may recover any amount lost to him on account of contracts made on the faith of this rate.

CLAY & CLAY for appellant.

CHAS. H. MOORMAN, YEAMAN & YEAMAN and BENJAMIN D. WARFIELD for appellee.

OPINION OF THE COURT BY JUDGE CARROLL—Reversing.

The appellant, Crescent Coal Company, is the business name assumed by Joe Higdon, who in 1908 was engaged in buying and selling coal in the city of Henderson. The appellee, Louisville & Nashville Railroad Company, was at the time and is a corporation organized under the laws of Kentucky and engaged in the business of a common carrier of passengers and freight. Its main line of road runs into and through the city and in addition to its main line it operates and controls what is called a

belt line, running from its main line in two directions through the city. Leading from its main and belt lines, there were a number of spur tracks that run into various industrial plants in the city of Henderson, situated near its main and belt lines of road. These spur tracks were used for the purpose of transporting freight to and from these industrial plants, and were operated by the company as a part of its line of road. The Keystone Mining & Manufacturing Company was engaged in the operation of a coal mine in the city of Henderson, and was connected with the main or belt line by a spur controlled and operated by the appellee company.

In April, 1908, Higdon in the name of the Crescent Coal Company conceived the plan of supplying the industrial plants in the city of Henderson that had spur connections with the main or belt line of the appellee company with coal mined from the Keystone mine. His purpose was to have cars furnished by the appellee company loaded with coal at the mine, and then transferred by the appellee company to the industrial plants in Henderson that had spur connections. With this object in view, he entered into a contract with the Keystone Company, by the terms of which he was to be furnished by it during the year beginning July 1, 1908, 20,000 tons of coal, which it was stipulated in the contract should be delivered to him on the spur track at its mine. Another contract made in May, 1908, gave him the right with certain conditions to sell the output of the mine in excess of 20,000 tons. After making these contracts with the Keystone Company, he contracted with various industrial plants having spur connections with the line of the appellee company to deliver to them at their plants in carload lots, at a stipulated price, a large quantity of coal. On July 1, 1908, he applied to the appellee company to furnish him cars at the Keystone Company's mine to be loaded with coal and hauled by it to the industrial plants, and proposed to pay for the services four dollars per car, which would be about ten cents per ton. The appellee company refused to furnish any cars for this service until July 13, 1908, when it notified Higdon that it would furnish cars but would charge for the service fifty cents per ton. This offer, which was kept open until August 13, 1908, Higdon refused to accept, and on August 13, the appellee company informed him that it would not furnish cars for this service at any price. Thereupon Higdon

brought this suit against the appellee company, setting up his contracts, and the action of the appellee in preventing him from fulfilling them, and sought to recover damages to compensate him for the loss he had sustained. The action was brought on the ordinary, or common law, side of the docket, but on motion of the appellee company was transferred over the objection of the appellant to equity, and upon hearing, the petition was dismissed.

A number of legal questions are presented by the record, and we will endeavor to dispose of such of them as seem essential to a solution of the matters in controversy. The first and perhaps the most important question is: Was the appellee company under a duty as a common carrier of passengers and freight to render this service?

The evidence for appellee conduces to show that the coal mine and the industrial plants located in Henderson to which Higdon desired to deliver coal were all located within what are called the "switching limits" of the appellee company. It is, therefore, said that it should not be treated as a common carrier or charged with the duty of transporting freight as a common carrier from one point within these limits to another point within them. A common carrier, such as the appellee company was, may undoubtedly have what may be called yard facilities, including switches, spurs and side tracks for its convenience in the handling, storing and distribution of its cars and freight, and it would not be obliged as a common carrier to transport from one point to another in these yards or on these spurs or switches, freight for the convenience of shippers who might desire to have freight hauled from one point on a switch or spur in the yard to another point in the yard. In the use of tracks laid in its yards for its own convenience in handling, storing and distributing cars and freight, a common carrier cannot fairly be said to be engaged in the business of a common carrier in the sense that it must receive and deliver as at other points on its line of road freight or passengers. A rule like this would impose an unreasonable duty upon a common carrier and unnecessarily hinder and interfere with the conduct of its business. It is essential in the operation of railroads that they should have at terminals and other places where the business requires it, yards and facilities that they may use in the conduct of their business, in such a way as not to be incon-

venienced by the necessity of receiving and unloading goods for shippers. But, we are not inclined to treat what the appellee company terms its "switching limits" in the city of Henderson as coming within the meaning of yards and terminals, such as we have described. The spur tracks to the coal mine and the industrial plants were not constructed, nor were they operated for the convenience of the appellee company in handling, storing and distributing its cars, engines and other property. As we will presently show, they were constructed and were being used as a part of its railroad system, in carrying freight for compensation to and from the plants connected with its main line of road by these spur tracks. It is true these spur tracks were within what it called its "switching limits" and extended to factories and mills situated close to its line of road, but we regard as wholly immaterial, in the consideration of the question before us, the length of the spur track, or the kind of business establishments it connects the line of road with. Nor do we consider it a matter of any consequence how close together spur tracks, such as these, are located, or whether they are upon one part of its line or another. Whether they run to factories or mines in cities or towns, or to industrial plants in country districts, whether they are long or short, or close together or widely separated, they are to be considered a part and parcel of the system constructed and operated in its business as a common carrier, and the public have an interest in their conduct and operation that the carrier must respect. A railroad company owes to establishments connected with its line of road by these spur tracks the same duty that it does to establishments situated immediately upon its main line of road. It is under the same obligation to furnish facilities for transportation to one as it is to the other. It must serve all alike. Nor can a railroad company arbitrarily and without any relation to the use to which it is put designate a part of its track or system as "yards or switching limits" and then say that it owes no duty as a common carrier in this district except such as it may choose to assume, or, say that it will or not as suits its pleasure or convenience perform service as a common carrier in this territory. A railroad company engaged in the general business of a common carrier cannot without out regard to the convenience of the public classify or divide its trackage into divisions or parts and say that

on one part it is a carrier and on another it is not. In the discharge of its duties to the public as a common carrier, a railroad company may establish reasonable depots or places at which it will receive and deliver freight, and cannot be required to receive or handle it at other places; but, it must use for the public convenience all the tracks set apart by it for the transportation of freight, and treat without favor or discrimination all persons offering to it freight for carriage. The spur tracks to these various plants in Henderson were no more a part of its "yards or switching limits" than would be a spur track that connected its main line in a country district with a mill or factory.

It is shown by the evidence that the appellee company in 1908, and for a number of years prior thereto, had been in the habit of transporting carloads of freight from industrial plants in Henderson with spur connections to other industrial plants in Henderson with spur connections, but that it had never performed this service for the Keystone Company. For example, it would haul a carload of corn from an elevator, connected with its belt or main line by a spur track, to a mill connected with its main or belt line by a spur track; but it would not haul a carload of coal from the mine to either the elevator or the mill. In explanation of this practice, and for the purpose of showing that it involved a different character of service from that sought by Higdon, it attempted to show and did so do by its traffic agents, that the service it performed in hauling products from one industrial plant to another, such as from the corn elevator to the mill, was merely auxiliary or incidental to a transportation service that preceded or followed this local movement. Or, in other words, when it hauled for a nominal charge a carload of corn from the elevator to the mill to be converted into foodstuff of some kind, this foodstuff would necessarily be sold to parties outside of Henderson and, therefore, it would get what it calls a transportation charge for hauling the food product from the mill at Henderson to the place it was shipped. And so it would be compensated in the transportation haul for the service it rendered in switching the cars from the elevator to the mill at a nominal price. It is said, however, that if coal was hauled from the Keystone mine to a factory to be there consumed, the carrier could not get another haul out of this coal or the substance to which it was re-

duced, and, therefore, it had the right to decline to render in the transportation of coal the character of service that it rendered in the transportation of corn. Looking at this question from the standpoint of the traffic manager of the appellee company, it doubtless presented to his mind sufficient reasons why the discrimination should be made. But, when considered in relation to the duties a common carrier owes to the public, it was wholly unjustifiable. A common carrier may, under certain conditions, hold itself out to the public as being a common carrier of certain articles of freight, and if it was only engaged in the carriage of specified articles, it would not be under any obligation to carry other things. If it carried for every person, who offered it, the articles and things that it held itself out to the public as a carrier of, it could not well be said to be guilty of discrimination. Hutchinson on Carriers, volume 1, sections 59, 90, 144. But, as the appellee company was engaged in the business of carrying coal, as well as all other articles of merchandise and freight offered to it, it had no right to make any discrimination between shippers, and was obliged to carry for all persons all classes and character of freight offered to it. Bassett & Stone v. Aberdeen Coal & Mining Co., 120 Ky., 728. The argument is further made that it had persistently and uniformly declined to haul coal from this mine to places in Henderson and this was well known to Higdon when he made the contracts referred to, but this custom did not confer upon it the right to continue the discrimination. That it had never engaged in the business of carrying coal in the manner desired by Higdon, did not, under the circumstances of this case, authorize it to refuse to render the service when demanded. No length of time, or manner of treatment, or habit of dealing, will discharge a common carrier from the obligation to furnish to the public the service it is engaged in performing. The appellee company could not transfer between mills and factories corn, wheat and other articles and refuse to transfer under the same conditions coal.

It follows from these conclusions that the appellee company was not justified in refusing to render the service requested by Higdon.

The next question is, What rate did it have authority to charge for his service? In April, 1908, the appellee company published and issued a book containing its tariff rates. In this book we find the following: "The Louis-

ville & Nashville Railroad Company does not engage in the business of local switching between switches, tracks, warehouses or industries in the Henderson, Kentucky, terminals, but where any such service is performed as an accommodation, a charge of two dollars per car plus two dollars for car rental shall be assessed.'' This tariff rate was in force from May 4, 1908, until after July, 1909. It was this rate that Higdon demanded that the appellee company should charge for the service he requested. The railroad company, however, insists that this tariff rate was not intended to and did not embrace the character of service Higdon desired. Its general traffic manager testifies that this provision in its tariff sheet was made for the sole purpose of fixing a rate at which it would transfer cars between warehouses or industries that it had hauled from other points to Henderson, or that were loaded at Henderson for shipment to other places. For example, if a carload of freight was shipped from Memphis, Tennessee, to the Henderson mills at Henderson, it would charge the regular transportation price from Memphis to its depot in Henderson, and in addition, $4 for delivering the car from the depot to the Henderson mills on the spur track that run into its establishment. Or, if a carload of food product was delivered to it by the Henderson mills on the spur in a car furnished for that purpose, it would charge four dollars for carrying this car from the mills to its station in Henderson, and in addition charge the regular traffic rate for hauling it from there to the point of destination. In other words, the rate did not cover or contemplate a service in which a long haul did not follow or precede the movement of transferring the car to or from an industry in Henderson to its depot. Based on this theory, it is argued that the appellee company had not established or put in force any rate for the service demanded by Higdon at the time he requested it, and so it had the right to afterwards fix the rate at fifty cents per ton, which it did on July 13. It is further said that this rate was reasonable, and as Higdon declined to accept the service at this price the company was thereby relieved from liability to him, unless he first brought the matter to the attention of the railroad commission and obtained from that body a ruling that the rate was not reasonable. If it were true that the appellee company had no fixed or established rate that covered this service at the time it was requested, we have no doubt of its right

to fix a reasonable rate. We are further of the opinion that if the rate so fixed was reasonable and Higdon declined to accept it, he would not have any cause of action against the company growing out of the state of facts set up in his petition. Whether it is a condition precedent to the bringing of an action for damages on the ground that a rate fixed for a particular service is unreasonable, that the shipper must first obtain a ruling from the railroad commission, it does not seem necessary to decide in the view we have of the case. It will be observed that the tariff rate previously quoted recites that the railroad company does not engage in the business of local switch-ing between switches, tracks, warehouses and industries in Henderson. But we have already determined that this declaration of what service it would perform did not authorize it to refuse to carry coal from the mine to the warehouses and industries in Henderson having spur connections. Therefore, so much of the provision as asserts that it will not perform this service need not be further noticed. If the rate fixed was only for service rendered incidental to and in connection with a transportation service from which the company derived a benefit, and it was only a reasonable rate when considered in connection with the additional rate charged for transportation service, there would be much force in the argument that it was not a reasonable rate for the carriage of coal from the Keystone mine to industries in Henderson, as the company would get no other compensation from this service. But, conceding this, we are unable to relieve the company from the condition in which it voluntarily placed itself under the mistaken assumption that it was not required to render at all such service as Higdon requested. Undoubtedly the appellee company had the right to classify freight and make a reasonable difference in its charges for different kinds of freight transferred to or from one industry to another in Henderson. Its authority to make this classification and to fix different rates was as extensive as its authority to classify and charge different rates for different kinds of freight transported from one point to another outside of Henderson. But, in publishing its tariff rates for the information and use of the public, it did not stipulate for different rates or make any classification. It said in substance that when it transferred cars from one industry to another in Henderson it would charge for the service four dollars.

Having thus established and promulgated the rate it would charge without any attempt to designate the character of freight it would transport for this charge, we do not feel authorized to interpret this rate as meaning that it would be charged for corn or flour or meal and not coal, or to limit its application to any particular article. The appellee company is bound not only by its published rate, but by its course of conduct under this published rate. It is shown by the evidence that for many years and whenever requested it transferred from one mill or industry to another mill or industry in Henderson, connected by spur tracks with its main or belt line, carloads of freight of different kinds and charged for this service the established rate. So if there was doubt about the meaning of this published rate, or the character of service it applied to, we find that the appellee company in its course of business construed it to mean that it was under a duty to, or at least would for the charge named, transfer loaded cars of freight from one factory or mill to another. Under these facts it was plainly a discrimination against Higdon to refuse to perform the service for him at the price charged to others for a like service. Union Pacific R. Co. v. Goodrich, 149 U. S., 680; 37 L. Ed., 996; Alabama & V. R. Co. v. Railroad Commission, 203 U. S., 494; 51 L. Ed., 289. If the appellee company had confined the transfer service to such service as was incidental to transferring cars of freight to and from its depot to mills and industries, there would be much force in the contention of counsel, but as it did not pursue this course of conduct we must treat the case as we find it and as it was made by the appellee company. The rate as published covered all service, and did not specify what character of freight it applied to or make any distinction between corn and coal. If under this rate it was obliged to, or did in its course of dealing, transfer wheat, corn or other produce for certain persons from one point in Henderson to another, then it was obliged to perform this service upon the same terms and conditions for all persons demanding it, without reference to the class of freight hauled. Constitution, sections 214, 215. In the absence of a tariff or rate classification by the appellee company we cannot say that a higher rate should be charged for hauling coal than should be charged for hauling corn or wheat. Further insisting on its right to make a distinction between these articles and to support the con-

tention that the published rate was not intended to and did not apply to coal, it is said that when it hauled a car of freight from a mill or industry or from one industry to another in Henderson, it did so with the expectation that the freight so transferred would be converted into some article by the mill or industry receiving it and then shipped to points out of Henderson over its line, thus giving it what it calls a transportation haul or a haul out of which it would be compensated for the transfer service from factory to mill. This contention is entirely lacking in merit. It might be argued with as much force and relevancy to the issue that as the mills could not be operated without coal, therefore it should haul coal from the mine to the mill so that produce might be manufactured that the appellee company could haul to points outside of Henderson.

We have examined the case of Dixon v. Central of Georgia R. Co., 110 Ga., 173, 35 S. E., 369, but do not find it applicable to the state of facts presented by the record before us. In that case the question before the court was whether or not the service was "transportation service" or "switching service," and under the facts of that case it was held to be "transportation service," and, therefore, the charge established for "switching service" was not applicable. In the case we have, our conclusion that the rate of four dollars per car was applicable to the service demanded, although it is described in the tariff sheet as "switching service," is largely rested upon the ground that the company charged this rate to other shippers for a like service. In the Dixon case it does not appear that the question that influenced our decision upon this point was before the court. If the question of the applicability of the tariff rate we have quoted was submitted to us freed from the construction given to it by the appellee company in its dealings with reference to the transfer of freight between other industries, we would say that it did not apply to the service sought by Higdon. It seems to us that the service Higdon desired was not "switching," but "transportation" service. It was the same kind of service that the appellee company would have performed if a car was loaded with coal at a mine at any point on its road, and then hauled to the customer to whom it was consigned. But the appellee company in its course of conduct treated what might properly be called "transportation service" as "switching service,"

and applied to it the rate it now claims is only applicable to "switching service." This being so, we again repeat that it cannot be allowed to make any discrimination between Higdon and others similarly situated.

Coming now to the amount of damages Higdon is entitled to recover, he had two contracts with the Keystone Company. In one contract, dated April 5, 1908, it agreed to furnish to him during the year not more than 20,000 tons, and it was in reliance upon this contract and the four-dollar rate he anticipated the appellee company would charge that he contracted to furnish to various industries about 14,000 tons. He also had other contracts to furnish coal to industries having spur connections, made before the contract with the coal mine, that it appears he could have filled with its coal. By the terms of the other contract, made in May, 1908, the Keystone Company appointed Higdon its sole agent in the city of Henderson to sell for it in the city coal in carload lots. But this contract stipulated that:

"The first party (Keystone Company) does not obligate itself to furnish for or on account of the second party (Higdon) under this contract any given quantity of coal, nor shall it be required to furnish any coal which shall interfere with the supply of coal on the local market in less than carload lots or by wagon loads. It being the mutual understanding that the first party shall supply its local trade by wagon delivery, shall fill the contract made with the Crescent Coal Company, signed by said Joe Higdon, and if then it has any coal on hand the said Joe Higdon shall have the refusal and the first party shall not have any right to ship it elsewhere if the second party should desire to use it under this contract in carload lots."

It will be observed that it was virtually optional with the Keystone Company whether it furnished Higdon any coal under the May, 1908, contract, and upon the record before us we do not think he is entitled to any damages under this contract, as it does not appear that on the faith of it he made any contracts that caused him to suffer any loss. On the contract made in April he is entitled to recover the difference between what it cost him to fill the contracts he had made, whether before or after July 1, 1908, with industries having spur connections, and that he could have filled with coal from the Keystone mine between July 1, 1908, and July 1, 1909, and what it would

have cost him to fill these contracts if he had obtained coal from this mine. As it appears that this mine ceased operations before July 1, 1909, the damage should be confined to the quantity of coal that the Keystone mine could have supplied under the contract before it ceased operations, and that he could have furnished in fulfillment of the contracts made with customers before that time. Upon these issues, the appellant was entitled to a jury trial.

Wherefore, the judgment is reversed for a new trial in conformity with this opinion.