IN RE ESTATE OF JAMES J. RANSOM.

PEOPLES GAS & ELECTRIC COMPANY, Appellants, v. JAMES D. SMYTH et al., Executors, Appellees.

No. 42571.

DECEMBER 11, 1934.

La Monte Cowles, Mark A. Walsh and Donald J. Pierr, for appellants.

Ben P. Poor, for appellees.

MITCHELL, C. J.—On the 25th day of February, 1929, the appellants filed in the district court of Des Moines county, Iowa, a verified claim against J. D. Smyth and Theodore Kriechbaum, executors of the estate of Dr. J. J. Ransom, for $866.63, with interest thereon. On September 11, 1931, the appellants filed an amendment to their claim, in which they set up that they had an oral contract with Dr. Ransom to furnish him electric light service for his residence at the rate of $6.25 per month; that the exact amount of electricity which he used cannot be set out, as said electricity was not furnished on a meter basis, but was furnished on a flat rate plan; that the contract was entered into in 1916, and that bills were rendered each month to Dr. Ransom from 1916 to 1925; and that at the time of his death he was indebted to the claimants for 91 months electric light service at $6.25 per month, being a total of $568.75. In addition to said amount, he was indebted to claimants for merchandise items which had been charged on the electric light account in the amount of $83.10. The appellants seek to recover, first, on the oral contract and, second, upon a quantum meruit basis. To this claim the executors of the estate filed an answer, setting up, first, a general denial; second, statute of limitations; third, that the city of Burlington, Iowa, in which city the claimants operated their electric light and gas plant, had granted to the Peoples Gas & Light Company a franchise in the year 1902 for a period of 25 years, and that said ordinance established the rate to be charged for electric current; that said ordinance constituted a contract between said city and said company for the benefit of the users of electricity within said city, and said ordinance also constituted a governmental regula-

tion of electric light rates; and that said alleged flat rate charges were discriminatory, against public policy, illegal, null, and void.

A jury was chosen, and the case proceeded to trial. At the close of the evidence, the executors made a motion to direct a verdict, which motion was sustained by the court and judgment entered against the Peoples Gas & Electric Company for the costs. Thereafter motion for new trial was filed by the appellants, which was overruled. The appellants, being dissatisfied, have appealed to this court.

The Peoples Gas & Electric Company operated a gas and electric plant in the city of Burlington, Iowa, under a franchise granted to them by that city. Dr. J. J. Ransom was the president of the American Trust & Savings Bank of Burlington. He had, from the description set out in the record, a very elaborate and magnificent home, which had installed in it 130 to 140 electric lights. The entire house from basement to attic and the garage were wired for electricity. Some time in 1916, it is the claim of the electric company, an oral agreement or contract was entered into with Dr. Ransom whereby the Peoples Gas & Electric Company agreed to furnish all the electricity that Dr. Ransom needed for his home at a rate of $6.25 per month. It appears from the record that Dr. Ransom did not pay his account monthly, but that it was permitted to run from month to month and from year to year. On October 10, 1916, Dr. Ransom paid the sum of $918.35, which paid his bill to May of 1916. The doctor then paid $6.25 per month for seven straight months, and after that he again allowed the bill to run on without any further payments until after the claimants sold the electric light plant in 1924 to the Iowa Southern Utilities Company. Under the agreement of sale to the Iowa Southern Utilities Company, the claimants were to retain the accounts accrued up to August 1, 1924, and to remain in possession until January 1, 1925. Dr. Ransom never paid anything on his electric bill to the claimants from December, 1916, to August 1, 1924; in other words, for a period of over seven years, the doctor, a man of means, president of the largest bank in Burlington, did not pay his electric bill. Why he was so favored does not appear in the record. Why a meter was not installed does not appear in the record. According to the claimants, the agreement was one to furnish all the electricity that the doctor needed to light his home, at the rate of $6.25 per month.

Many questions are raised in this case. It will only be necessary for us to discuss one of these questions. The city of

Burlington, Iowa, by ordinance fixed the rate to be charged for electricity. The title of the ordinance is: "An Ordinance Regulating and Fixing the Rate of Charge for Electric Light within the City of Burlington, Iowa." But, the appellants say, this was only a maximum rate, as shown by sections 2 and 3 thereof. With this we cannot agree. The ordinance in section 1 without doubt or ambiguity fixes the rate charged at a certain, definite price to be charged for electricity per month. This section, in part, reads as follows:

"Sec. 1. That the rates of charge for electricity for light furnished the users thereof, within the Corporate limits of the City of Burlington, Iowa, be and the same are hereby regulated, fixed and established as follows:

"First 175 kilowatt hours per month—10¢ per k. w. hour.

"Next 225 kilowatt hours per month—9¢ per k. w. hour * * * "

Section 2 of the ordinance provides:

"No person, firm or corporation supplying electricity for light within the limits of the City of Burlington, Iowa, shall make any charge in excess of the rates set out in Section 1 hereof, nor shall any person, firm or corporation exact or receive any amount in excess of the rates in said section established for electricity delivered for light within the limits of the City of Burlington, Iowa."

In January of 1918 the city of Burlington passed what is known as a regulatory ordinance, which was practically the same as the first ordinance, except as to the amount to be charged; the rate to be paid by the user of electricity being increased. And after that the city of Burlington passed what is known as a third ordinance, which also increased the rates to be charged for electricity, with practically the same provisions as in the other ordinances. It is the claim of the appellants that a $6.25 charge was not in violation of the terms of said ordinance, because the only restriction in the ordinance was that the rate charged should not exceed 15 cents per 1,000 watts, now usually designated as 15 cents per k. w. (1,000 watts being one kilowatt or one k. w.). With the house which is described as the home of Dr. Ransom, with the number of lights in it, equipped with lamps burning from 60 to 120 watts each, and with the evidence showing that the house was always well lighted, the appellants claim this shows that the rate charged was not in excess of the ordinance rate. We would be willing to concede that

the amount of electricity which the good doctor used in his palatial home exceeded the ordinance rate of 15 cents per kilowatt. But the ordinance says nothing about any maximum rate, and, clearly, it was contemplated that the electricity should be metered out and not guessed at as to the amount consumed. Any rate in excess of the rates fixed in the ordinance, or any rate below such rate, so fixed, was inconsistent with the ordinance and illegal and against public policy. There is no question that the city of Burlington had the right to make the rates. By its ordinances it fixed the rates. To permit of lower rates, such as the agreement which the company had in this case with Dr. Ransom, would at once open the door to discrimination and favoritism, which has, after so long a struggle, been largely eliminated in our public utility activities. If the electric company had a right to agree to furnish electricity at $6.25 per month, it would have the right to furnish electricity for $1 per month. The rates that other consumers must pay for electricity are fixed upon the volume of business which the company does and the income which it receives. If a favored few are permitted to receive their electricity at a lower rate or for practically nothing, then those unfortunate individuals who do not fall into the favored class are forced to pay a higher rate than they would be if all paid at the same rate. This, of course, is against public policy. The authority of the city of Burlington to establish and fix rates cannot be in this day successfully questioned. The right to fix rates was surrendered by claimants when they under their franchise exercised the privilege of occupying the streets of the city of Burlington with their poles and equipment and selling electricity to the citizens. The city of Burlington did fix the rate to be charged for electricity at so much per 1,000 watt hours. This naturally contemplated a meter service and a meter charge. Any other thought would open the door to excessive fraud and defeat the governmental rate. Any charge not on a meter basis would be inconsistent with the charge so fixed by the city, as it would be impossible for anybody to tell under ordinary use the amount of electricity consumed.

The Wisconsin court had this matter before it in the case of President and Trustees of the Village of Kilbourn City v. Southern Wisconsin Power Company, 149 Wis. 168, 135 N. W. 499. On page 504 of 135 N. W., the court said:

"Of course, the defendant had the power to contract to buy, and the plaintiff the power to contract to sell, the right to overflow the

land of the latter, and they had the right to agree on the compensation to be paid; but they did not have the right to agree that full compensation should be made, and that, in addition thereto, the plaintiff should receive annually from $3,500 to $4,500 worth of free power. All subterfuges, whereby one consumer is called upon to pay a greater or a lesser rate than that prescribed in the published schedule of charges, or whereby one consumer obtains a preference, or advantage over another, are condemned. The scope, effect, and purpose of the law is considered at length in La Crosse v. La Crosse G. & E. Co., 145 Wis. 408, 130 N. W. 530, and it is unnecessary to elaborate or repeat what is there said. The matter of giving concessions in rates in settlement of a claim for unliquidated damages was considered in Union Pacific Ry. Co. v. Goodridge, 149 U. S. 680, 13 S. Ct. 970, 37 L. Ed. 896; and it was held that such a contract was in violation of the interstate commerce act. Other cases holding that parties dealing with public service corporations must pay the regular schedule of rates for the service performed, and that these rates cannot be departed from by making a contract which recites a consideration for the departure, are L. & N. Ry. Co. v. Mottley, 219 U. S. 467, 476, 31 S. Ct. 265, 55 L. Ed. 297; Wight v. U. S., 167 U. S. 512, 17 S. Ct. 822, 42 L. Ed. 258; U. S. v. C. & A. R. Co. (D. C.) 148 F. 646; U. S. v. C., I. & L. Ry. Co. (C. C.) 163 F. 114; U. S. v. B & O. Ry. Co,. 165 F. 113, 91 C. C. A. 147; Interstate Commerce Commission v. Reichmann (C. C.) 145 F. 235; Armour Packing Co. v. U. S., 209 U. S. 56, 28 S. Ct. 428, 52 L. Ed. 681. Through a rigid enforcement of our laws, state and national, favoritism to the few by public utilities in the matter of rates has been very largely done away with, and the courts should be sure they are right before placing an interpretation on statutes dealing with rates of charge which would encourage a return to the old order of things."

In the case of Incorporated Town of Mapleton v. Iowa Public Service Co., 209 Iowa 400, at page 405, 223 N. W. 476, 68 A. L. R. 993, speaking through Justice Evans, this court said:

"Moreover, the municipality which exercises the power over a public utility to fix its rates, owes a corresponding duty to protect such utility against unfair competition by reason of such regulation. The railway legislation of the country gives universal recognition to this principle. Rates, fixed under the supervision of the

Railroad Commission must be adhered to by every carrier. The rate charged must be neither greater nor less than that fixed in the schedule. We think that the plaintiff may likewise enforce its ordinance rates."

And so it seems to us that claimants are not entitled to recover upon the alleged oral contract that it made with Dr. Ransom to furnish electricity to him for consumption in his home at a flat rate, as same was contrary to the provisions of the ordinances passed by the city of Burlington, Iowa, and to permit such contracts would be against public policy and would open the door to discrimination and favoritism.

But the appellants claim, if they are not entitled to recover upon the oral contract, they are entitled to recover on a quantum meruit basis. It is not necessary for us to answer this question, as there is no evidence in the record upon which a jury could ascertain the amount of electricity which Dr. Ransom used during this period of years in kilowatt hours, for, if the appellants are entitled to recover upon a quantum meruit basis, they would have to recover at the rate set out in the ordinance, which provides for so many cents per kilowatt hour. And, as there is a failure of proof upon this matter, appellants would not be able to recover.

 The ordinance, however, provides that the appellants are entitled to a minimum charge of so much per month. There is evidence in the record from which the jury could have found that the appellant company furnished electricity to Dr. Ransom; that during this period of time his house was connected with the wires of the appellant company; that electricity was used during that period of time. And under this showing it was for the jury to say whether or not the appellants would be entitled to recover what is known as the minimum charge which is provided by the ordinances passed by the city of Burlington.

■ The appellants also claim a right to recover for a stove and other merchandise furnished to Dr. Ransom. There is evidence in the record from which the jury could have found that the stove was delivered to Dr. Ransom, and the value of said stove. This also applies to other merchandise alleged to have been furnished by the appellant company. The only defense made against this is that the statute of limitations has run. The record in this case shows an open, continuous, running account, and bills were rendered monthly to Dr. Ransom. In view of this showing, the statute of limitations

would not apply, and the question of whether the appellants would be entitled to recover for the merchandise which they claim they furnished Dr. Ransom would be a question for the jury to decide upon the evidence submitted.

As the lower court directed a verdict against the appellants, the judgment and decree of the lower court must be, and it is hereby, reversed, and the case remanded.

EVANS, ALBERT, KINDIG, and DONEGAN, JJ., concur.