## DAVISON GULFPORT FERTILIZER CO. v. GULF & SHIP ISLAND R. CO.*

### No. 8338.

Circuit Court of Appeals, Fifth Circuit.

July 20, 1937.

*Writ of certiorari denied 58 S.Ct. 141, 82 L.Ed. —.

B. E. Eaton, of Gulfport, Miss., for appellant.

Oscar Backstrom and Hanun Gardner, both of Gulfport, Miss., Elmer A. Smith, of Chicago, Ill., and Charles N. Burch, H. D. Minor, and Clinton H. McKay, all of Memphis, Tenn., for appellee.

Before FOSTER, HUTCHESON, and HOLMES, Circuit Judges.

HUTCHESON, Circuit Judge.

On various dates, between December, 1928, and October, 1934, appellee, a common carrier, performed services, including wharfage, for appellant in regard to commodities moving coastwise interstate. For these services it exacted and received the charges provided therefor in tariffs the carrier had duly filed with the Interstate Commerce Commission. Appellant paid the charges without objection or protest, and without complaint as to their reasonableness or validity; nor does it now complain that the services rendered were not fully worth the charges made. What is claimed by appellant in this suit it brought in 1935 to recover the total of the wharfage charges, is that by contract with the United States made June 18 pursuant to a public resolution adopted June 14, 1906,[1] both attached as exhibits to the petition, appellee completely ceded to the Secretary of War all of its powers to make and publish wharfage tolls, fees, or charges; that the charges in question having been made and filed with the commission without his approval, their making and filing was a nullity; that appellant was entitled to have the carrier render it wharfage services free of charge; and that it was therefore entitled to recover back the charges it had paid. Nine special pleas were filed by defendant. To these were attached as exhibits copies of the published schedules of tariffs it had filed with the commission, and under which the wharfage services had been rendered and paid for.

By replication to the pleas plaintiff, in confession and avoidance, pleaded the joint resolution and contract set out in the margin below; that in 1911, at the request of defendant, the Secretary of War had established rates and charges for wharfage, except as to commerce coastwise; and that, thereafter, until the filing of the tariffs involved in this suit, defendant had neither promulgated nor exacted wharfage charges for coastwise movements. It alleged that in 1927 defendant, purportedly under the authority of the tariffs its pleas describe, began to assess and did thereafter assess and collect of plaintiff, as charged in the declaration, wharfage charges on commerce moving coastwise, the same in amount as those the Secretary had approved for shipments other than coastwise.

---

[1] The resolution, after reciting a contract of February, 1901, for dredging a channel at Gulfport and completion of the contract, directed to pay the contract price,

"Provided, That the said amount shall not be paid over to the said Spencer S. Bullis, or other person or persons as aforesaid, until the person or persons, companies, or corporations owning or controlling docks, wharves, or terminals in, along, or upon said basin, or connected directly or indirectly therewith, shall execute an agreement that the charges for the use of said docks, wharves, and terminals shall be such as the Secretary of War may from time to time approve." (34 Stat. 833.)

The contract, after reciting the joint resolution, and that the Gulf & Ship Island Railroad Company was the real person in interest under the resolution, provided:

"Now, Therefore, in consideration of the premises, of the sum of One Dollar paid to the party of the first part, the receipt of which is hereby acknowledged, and further, of the great benefit which shall accrue to the party of the first part hereafter by the operation of said Joint Resolution, there said party of the first part hereby covenants and agrees to and with the party of the second part that the charges for the use of the said docks, wharves and terminals connected therewith, either directly or indirectly, to be made by said party of the first part, its successors, lessees or assigns shall be such as the Secretary of War may from time to time, forever, approve; that no tolls, wharfage fees, or dockage fees, or fees of any kind, character or description, for commodities carried over, or for the use of, said docks, wharves and terminals, shall be placed into effect and operation until they shall have been submitted to and approved by the Secretary of War; and that these covenants shall run with the title to said premises so as to bind the successors, assignees and lessees of the party of the first part."

By way of estoppel by conduct and claim it was further charged against defendant, that not only before the Secretary of War in the 1911 proceedings, but before the commission in 1931 and again in 1934, defendant railway company had consistently taken the position that the Secretary of War, and not the commission had sole jurisdiction over its wharfage charges, and that there was no authority in the commission to make or prescribe, oversee, or interfere with, such charges.

Finally, plaintiff insisted that the making and filing of the tariff schedules had furnished no authority for the imposition of the charges, because by its contract defendant had divested itself of, and vested in, the Secretary of War the initial authority to prescribe them, and that unless at least first approved by him, the filing of schedules with the commission would be wholly unauthorized, and without effect in law.

To this replication to its pleas defendant filed demurrers, in effect asserting that the Hepburn Amendment to the Interstate Commerce Act enacted June 29, 1906, 34 Stat. 584, and the later amendments to the act, 49 U.S.C.A. § 1 et seq., had vested the commission with complete and comprehensive jurisdiction over commerce moving interstate. That it had superseded and made unnecessary, as to interstate rates and charges, including those for wharfage, the protective provisions of the Resolution and contract upon which plaintiff relies; that the rates were therefore properly charged and exacted; and that in this action for moneys had and received plaintiff could not recover them. The demurrers challenged too, as immaterial the allegations in the replication as to the defendant's course of conduct in asserting that the Secretary of War, and not the commission, had jurisdiction over these rates.

The District Judge sustained the demurrers and, plaintiff declining to plead further, dismissed its bill.

Here the controlling question arising on the pleadings whether the public resolution and contract plaintiff relies on deprive the commission of jurisdiction over the wharfage rates in question, is made more sharp and clear by a stipulation; that "the tariffs

on which the charges were collected were published and filed with the Commission in strict accordance with the terms and conditions of the Act to regulate commerce, and amendments thereto, and the rules and regulations of the Commission"; and that "unless authority to supervise and regulate the wharfage rates in question in this suit was at the time of their making and filing, and of the payment under them, vested in the Secretary of War under the joint resolution and contract, the said schedules of tariffs were lawful schedules and the charges for which plaintiff seeks restitution as being unlawful, were lawful charges, which the defendant had the right to collect and retain." Thus by the stipulation, the parties make stand out the controlling question in the case, whether the existence of the resolution and contract destroyed defendant's power to initiate rates under the Interstate Commerce Act (49 U.S.C.A. § 1 et seq.), and nullified the schedules it filed with the commission unless and until it first presented its proposed schedules to the Secretary of War and received his approval. Thus they make stand out plaintiff's contention that the charges asked and received, though reasonable in themselves, and the same charges the Secretary had approved for commerce other than coastwise, were unlawful charges and uncollectible, and ex aequo et bono in an action for money had and received, defendant was bound to return them.

Here, as it did below, appellee insists that the authority of the commission under the Hepburn, and the various other amendments to the Commerce Act, is comprehensive, universal, and all-embracing; that it extends to wharf and other terminal charges; to Gulfport as to all other ports; that the charges it collected upon tariffs filed with the commission constitute the only lawful charges under which the shipments in question could have moved; and that, once fixed by filing, defendant could neither forego them before collection, nor rebate nor return them after collection. It insists that the sole purpose and intent of the resolution and contract by which plaintiff sets such store, its only effect, was to make provision, where, before the passage of the Hepburn Amendment [2] none existed,

---

[2] "This Amendment amplifies the definition of 'railroad' and 'transportation' appearing in Section 1 of the Act.

"The term railroad was enlarged to include all switches, spurs, tracks and terminal facilities of every kind used or

necessary in the transportation of persons or property designated herein, and also all freight, depots, yards and grounds used or necessary in the transportation or delivery of any such property.

"The term 'transportation' as used in

against the exaction of exorbitant and unreasonable charges for the use of defendant's wharves, not to prevent the making of any charge for that use. It urges upon us that the act of the Secretary of War, in approving wharfage charges except as to coastwise commerce, and disapproving those solely because that commerce was negligible, is a definite affirmation that the resolution and contract·were designed not to prohibit, but to regulate such .charges, to require the defendant to furnish not free, but reasonable service. It argues, too, that if there is anything in plaintiff's contention that before filing its tariffs with the commission, defendant ought to have submitted them to and obtained the approval of the Secretary of War, it is not substantial but only formal. It insists that, since it is admitted that the charges are reasonable, indeed, are the same in amount as those the Secretary has already approved for a like service, the claim may not prevail in an action of substance like this for money had and received where only matters of substance may be availed of. Plaintiff, in short, may not recover here upon the mere showing that the charges exacted were informally initiated by tariffs filed by defendant with the commission before the formal step of submitting them to the Secretary of War had been complied with. It must show that in themselves they were unreasonable exactions for the services rendered, and having by pleading and stipulation admitted that they were reasonable, it may not recover.

We agree with appellee. .We think it may not be doubted that nothing in the circumstances of, the making of the resolution and contract, nothing in them, supports the claim that the Congress intended them forever to create, and forever maintain, an anomalous situation at Gulfport, by taking wharfage charges there out of the comprehensive general powers conferred upon the commission by the act. We are particularly sure that nothing in the resolution, the contract, or any·of the acts lends color to the idea that a shipper can avail itself of services rendered under regularly published tariffs

fixing reasonable charges, and having for years voluntarily paid those charges, recover them back upon a mere showing that they were not first submitted to the Secretary of War for his approval. The history of the long pending controversy, of which the pleadings and the briefs are full, over whether the power over wharfage rates at Gulfport is lodged with the Secretary, or with the commission shows that at times shippers have, and at times the railroad company has insisted that it is lodged with the commission, rather than the Secretary, while at times the shippers have and at times the railroad has put the Secretary forward rather than the commission. It shows that the first rates established by the Secretary of War were established and accepted in the nature of a compromise. It shows that wharfage charges on coastwise shipping were not then established merely because coastwise commerce at. Gulfport was so small as to be negligible. It shows, too, that the War Department, while insisting upon the observance of its supervisory authority over the rates, has recognized the commission as the proper body to investigate and determine what those rates should be, and it shows that the commission, while recognizing the interest of the War Department in the rates, has always maintained its full and complete jurisdiction over them.

At one of the many hearings involving charges at Gulfport, the examiner stated that the commission was dealing with the case with the full acquiescence of the Secretary of War. It was stated in the record and established by the letter of the Department that it wanted the Interstate Commerce Commission to deal with the charges and would approve its action regarding them.

American Warehousemen's Association v. St. Louis-San Francisco Ry. Co., 179 I. C.C. 531, involved wharfage rates at Mobile and Pensacola.

In its report the commission referred to the joint resolution and contract, saying, "Prior to the hearing, the Secretary of War stated in a letter to this Commission that he is prepared to revise the charges at Gulfport,

the Act was enlarged to include all service in connection with the receipt, delivery, elevation, and transfer in transit, ventilation, refrigeration or icing, storage, and handling of property transported." 49 U.S.C.A. § 1 (3). C/f Eichenberg v. Southern Pacific Co., 14 I.C.C. 250, affirmed in Southern Pacific Terminal Co. v. Interstate Commerce Comm.,

219 U.S. 498, 31 S.Ct. 279, 55 L.Ed. 310. C/f also Re Wharfage Facilities of Pensacola, 27 I.C.C. 252; Mobile Chamber · of Commerce v. M. & O. R. R., 23 I.C.C. 417; Wharfage Charges at Atlantic & Gulf Ports, 157 I.C.C. 663; United States v. Union Stock Yard & Transit Co., 226 U.S. 286, 33 S.Ct. 83, 57 L.Ed. 226.

if we find that they are unreasonably low and prejudicial to interstate commerce. None of the parties question our jurisdiction over the charges at Gulfport."

We set this history out not because we find it controlling, for we think it clear that we must determine the right of the contention made here not from the acts and conduct of the parties, but by the controlling law. We set it out because it makes crystal clear that no one has ever regarded the resolution and contract as conferring arbitrary power on the Secretary, or as requiring free service of defendant. We set it out because it leaves in no doubt that none has ever claimed for them that they were created or exerted as more than means to a desired end, the end that the charges for wharfage services should be reasonable. None has ever claimed, until in this suit, that they exist as ends making invalid and ineffective rates which have the commission's approval, and are admitted to be reasonable, merely because though the end desired by them has been obtained, the means devised in them have not been followed.

It stands admitted here that plaintiff, a common carrier, obligated by law to serve without discrimination, has rendered plaintiff valuable service and for a reasonable charge. It stands admitted here that these charges were exacted upon tariffs filed with the commission as the law requires of carriers. It stands admitted that no proceeding has been brought before the commission challenging the reasonableness of the charges, indeed, that their reasonableness is admitted. It stands admitted here that upon the sole ground that certain means for determining reasonableness in advance were not resorted to, plaintiff is seeking to recover back what it admits was reasonably exacted.

■ In order to sustain the judgment it is not necessary to decide that the Hepburn Amendment to the Commerce Act, and the later amendments to it, which have followed, have superseded the resolution and contract as to these rates, for to recover in this suit plaintiff must show not merely breaches of formalities by defendant in obtaining the money it sues for, nor merely a failure to comply with some positive provision of law. It must show that in equity and good conscience the money defendant has is really plaintiff's, and defendant ought not to keep it. Plaintiff has not done this. Atlantic Coast Line R. Co. v. Florida, 295 U.S. 301, 55 S.Ct. 713, 716, 79 L.Ed. 1451. As that case strongly puts it, "The question no longer is whether the law would put [defendant] in possession of the money if the transaction were a new one. The question is whether the law will take it out of his possession after he has been able to collect it." "In such cases the simple but comprehensive question is whether the circumstances are such that equitably the defendant should restore to the plaintiff what he has received." Johnston v. Miller, 31 Gel. & Russ. 83. C/f Rose v. McEachern (C.C. A.) 86 F.(2d) 231.

■ But these considerations aside, we think it quite plain that the wharfage charges at Gulfport are within the scope of the Commerce Act, that the tariff schedules embracing such charges filed with the commission were duly and properly filed; that for the services rendered the charges thus fixed were in law the proper and only charges for those services, and being such, they could not be foregone, nor, having been collected, could they be rebated or recovered.

The Commerce Act itself, section 1, title 49 U.S.C.A., under the heading "Carriers Subject to Regulation," in terms extends its powers and jurisdiction over all carriers alike. At no place in it is there any exception or exemption, either in terms or by implication, excluding a carrier such as defendant, because of its having made a contract. The Hepburn Amendment (34 Stat. 595, § 10) provides that all laws and parts of laws in conflict with its provisions, were thereby repealed. When the comprehensive purpose of the act, to bring about uniformity in rates and practices, as that purpose has been emphatically declared and given effect to by the Supreme Court,[3] is kept in mind,

[3] Texas & P. R. Co. v. Mugg & Dryden, 202 U.S. 242, 26 S.Ct. 628, 50 L. Ed. 1011; Texas & P. R. Co. v. Abilene Cotton Oil Co., 204 U.S. 426, 27 S.Ct. 350, 51 L.Ed. 553, 9 Ann.Cas. 1075; Texas & P. R. Co. v. American Tie & Timber Co., 234 U.S. 138, 34 S.Ct. 885, 58 L.Ed. 1255; Mitchell Coal & Coke Co. v. Pennsylvania R. Co., 230 U.S. 247, 33 S.Ct. 916, 57 L.Ed. 1472; Loom-is v. Lehigh Valley R. Co., 240 U.S. 43, 36 S.Ct. 228, 60 L.Ed. 517; Cleveland, C., C. & St. L. R. Co. v. Dettlebach, 239 U.S. 588, 36 S.Ct. 177, 60 L. Ed. 453; Standard Oil Co. v. U. S., 283 U.S. 235, 51 S.Ct. 429, 75 L.Ed. 999; Lewis-Simas-Jones Co. v. Southern P. Co., 283 U.S. 654, 51 S.Ct. 592, 75 L.Ed. 1333; United States Nav. Co. v. Cunard S. S. Co., 284 U.S. 474, 52 S.Ct. 247,

the conclusion is compelled, we think, that the wharfage charges in question fell under the jurisdiction and supervision of the commission; that the schedules were lawfully published and the charges they fixed were lawfully exacted.

Appellee urges upon us as conclusive of the question, Interstate Commerce Comm. v. United States ex rel. Humboldt Steamship Co., 224 U.S. 474, 32 S.Ct. 556, 56 L.Ed. 849, where the court held that the passage of the Hepburn Amendment had made the act completely comprehensive of the whole subject, and had entirely superseded the authority over railroad rates in Alaska theretofore conferred upon the Secretary of the Interior. Appellant, stressing the contract here as a grant or cession, and as depriving appellee of its powers as a carrier to initiate and fix rates, argues that the Humboldt Case is without bearing. It insists that there was merely an incidental and temporary conference of authority on the Secretary, while here, for a consideration, there was a grant ceding forever defendant's right to initiate rates.

We think this overvalues the granting words of the contract. The resolution for regulation was, the only authority for the contract. The contract is not effective beyond that authority. Rightly apprehended and construed, resolution and contract were intended to be, they were, merely means to a desired end, protection against arbitrary and unjust charges. Better means having been provided by the amendment and enlargement of the Commerce Act, resolution and contract became functus officio as to interstate commerce. As to this commerce, the Secretary's duties were over, his occupation gone. Under appellant's views, wharfage charges at Gulfport alone of all the ports in the United States, must have special treatment. They may be higher or lower than is asked for similar services at other ports, according to the uninformed opinion of the Secretary of War, instead of being subject to the informed discretion and administrative judgment of the commission as a part of a complete system of charges. And why should this be so? Because, as appellant says, the United States contributed $150,-000, to an enterprise which cost the railroad $1,650,000, and has since maintained the

port. Is there any port in the United States which has not obtained government assistance? Are there any wharves anywhere where government money has not been poured out to create, improve, enlarge, or maintain the water upon which they abut? The question is rhetorical; it needs no answer. Needing no answer, it furnishes, we think, the conclusive answer to the pretensions appellant puts forward here; that the assistance rendered by the government compels the construction of resolution and contract and of Gulfport's relations to the Commerce Act for which appellant contends; and that as to wharfage charges Gulfport stands aloof and alone "wrapt in the solitude of its own originality."

The judgment sustaining the demurrers and dismissing the action was right. It is affirmed.

HOLMES, Circuit Judge (dissenting).

The appellant seeks to recover the total of numerous charges for wharfage, paid to appellee on commodities moving through the port of Gulfport, Miss., in interstate coastwise commerce. It is alleged that the tariffs containing said charges were wrongfully promulgated, and filed with the Interstate Commerce Commission in violation of a contract between the appellee and the United States; and that, by reason of the breach of contract, made for its benefit as a member of the general public, and of the tort that followed, the appellant has been damaged in the amounts paid, with interest. I shall discuss this case without regard to the act of August 12, 1935 (49 U.S.C.A. § 3 (1), c. 509, 49 Stat. 607), since this cause of action had fully accrued on October 13, 1934, and was not affected by the passage of that act.

The principal defense is that a resolution of Congress authorizing the contract was repealed, and the contract itself abrogated, by the amendment of June 29, 1906, to the Interstate Commerce Act, known as the Hepburn amendment (34 Stat. 584, 49 U.S.C.A. § 1 et seq.). Acts inconsistent with the present contention of the railroad company, by way of estoppel, are pleaded by the shipper in a replication which contains a history of the development of said port since 1887. To this replication a demurrer was sustained, and, the appellant declining to plead

76 L.Ed. 408; Baltimore & O. R. Co. v. Brady, 288 U.S. 448, 53 S.Ct. 441, 77 L.Ed. 888; Terminal Warehouse Co. v. Pennsylvania R. Co., 297 U.S. 500, 56 S.Ct. 546, 80 L.Ed. 827.

further, judgment was entered for appellee.

The legal inquiry is limited principally (1) to ascertaining the intent of Congress in enacting the joint resolution, (2) to whether, by implication, that resolution was repealed by the Hepburn Act, and (3) to whether the contract made in pursuance of the joint resolution was abrogated. Our jurisdiction rests both on a federal question and on a diversity of citizenship.

The controlling legal principles may be presented briefly. A joint resolution has the characteristics and effect of law,[4] and is to be construed as other statutes.[5] It should be interpreted in the light of surrounding circumstances and with reference to the subject matter of the legislation.[6] If the purpose of the law has been expressed in plain and unambiguous language, and the act is within the power of Congress, the only duty of the court is to enforce it.[7] The covenant, executed pursuant to a joint resolution, is a legislative contract, and should be read in the light of the public policy sought to be accomplished at the time it was made.[8] The law does not favor repeals by implication, and if both statutes can reasonably be given effect, it should be presumed that such was intended.[9] This is especially true where one act follows closely upon the other at the same session of Congress.[10] Express legislation must control in the absence of subsequent legislation equally expressed.[11] A general statute will ordinarily not affect a special one, unless the provisions of the general are manifestly inconsistent with those of the special.[12] There must be an irreconcilable conflict between the two statutes, especially where the prior law is a special act relating to the particular case or subject, and the subsequent law is general in its operation.[13]

Wharves are aids to interstate commerce, but, being local in their nature, they require special regulations at particular places, and jurisdiction over them properly belongs to the states, in the absence of congressional legislation on the subject. It is the function of Congress, not the courts, to determine whether there shall be a partial or national uniformity, or none at all.[14] Competent congressional regulation is paramount and exclusive, superseding state laws and excluding further enactments by state Legislatures;[15] but it is not enough that the federal act invades the same field; it must expressly cover the precise subject matter or manifest a purpose to possess the entire field.[16]

Unless otherwise provided by statute, the carrier has the primary right to fix rates for transportation.[17] Under the Interstate

---

[4] Levey v. Stockslager, 129 U.S. 470, 9 S.Ct. 382, 32 L.Ed. 785.

[5] Ann Arbor Ry. Co. v. U. S., 281 U. S. 658, 50 S.Ct. 444, 74 L.Ed. 1098.

[6] U. S. v. Anderson, 9 Wall. 56, 19 L.Ed. 615; Tennessee Bond Cases, 114 U.S. 663, 5 S.Ct. 974, 1098, 29 L.Ed. 281; Utter v. Franklin, 172 U.S. 416, 19 S.Ct. 183, 43 L.Ed. 498.

[7] Doe ex dem. Poor v. Considine, 6 Wall. 458, 18 L.Ed. 869; U. S. v. Lexington Mill & Elevator Co., 232 U.S. 399, 34 S.Ct. 337, 58 L.Ed. 658, L.R.A.1915B, 774.

[8] Mobile & O. Ry. Co. v. Tennessee, 153 U.S. 486, 14 S.Ct. 968, 38 L.Ed. 793.

[9] U. S. v. Burroughs, 289 U.S. 159, 53 S.Ct. 574, 77 L.Ed. 1096.

[10] Morf v. Bingaman, 298 U.S. 407, 56 S.Ct. 756, 80 L.Ed. 1245.

[11] Rosencrans v. U. S., 165 U.S. 257, 17 S.Ct. 302, 41 L.Ed. 708.

[12] Rodgers v. U. S., 185 U.S. 83, 22 S.Ct. 582, 46 L.Ed. 816.

[13] Petri v. Creelman Lumber Co., 199 U.S. 487, 26 S.Ct. 133, 50 L.Ed. 281.

[14] Parkersburg & Ohio River Transportation Co. v. Parkersburg, 107 U.S. 691, 2 S.Ct. 732, 27 L.Ed. 584.

[15] Atchison, etc., R. Co. v. Harold, 241 U.S. 371, 36 S.Ct. 665, 60 L.Ed. 1050; Texas, etc., R. Co. v. Rigsby, 241 U.S. 33, 36 S.Ct. 482, 60 L.Ed. 874; Southern R. Co. v. Railroad Comm. of Indiana, 236 U.S. 439, 35 S.Ct. 304, 59 L.Ed. 661; New York Cent., etc., R. Co. v. Hudson County, 227 U.S. 248, 33 S.Ct. 269, 57 L.Ed. 499; Chicago, etc., R. Co. v. Hardwick Farmers' El. Co., 226 U.S. 426, 33 S.Ct. 174, 57 L.Ed. 284, 46 L.R.A.(N.S.) 203; Southern R. Co. v. Reid, 222 U.S. 424, 32 S.Ct. 140, 56 L.Ed. 257; Minnesota v. Barber, 136 U.S. 313, 10 S.Ct. 862, 34 L.Ed. 455; Cincinnati, etc., Packet Co. v. Catlettsburg, 105 U. S. 559, 26 L.Ed. 1, 169; Mobile County v Kimball, 102 U.S. 691, 26 L.Ed. 238.

[16] Savage v. Jones, 225 U.S. 501, 32 S.Ct. 715, 56 L.Ed. 1182; Missouri, etc., R. Co. v. Haber, 169 U.S. 613, 18 S.Ct. 488, 42 L.Ed. 878; Reid v. Colorado, 187 U.S. 137, 23 S.Ct. 92, 47 L.Ed. 108; Townsend & Bernard v. Yeomans, 57 S. Ct. 842, 81 L.Ed. 1210.

[17] Crescent Coal Co. v. Louisville, etc., R., Co., 143 Ky. 73, 135 S.W. 768, 33 L.R.A.(N.S.) 442.

Commerce Act, except in one detail not pertinent here, the carrier retains this primary right to fix rates.[18] The single exception is with reference to a greater charge for a shorter than a longer haul.[19] With this exception, not only is a carrier entitled to initiate rates, and "to adopt such policy of rate making as to it seems best,"[20] but "a zone of reasonableness exists between maxima and minima within which a carrier is ordinarily free to adjust its charges for itself."[21] This zone is wider at ports than at other localities.[22] Before altering a rate initiated by the carrier, it is a jurisdictional prerequisite that the commissioners hear evidence in the particular proceeding. "They cannot act upon their own information as could jurors in primitive days."[23] The rates in controversy, like the great mass of rates, are carrier-made,[24] not commission-made,[25] and, apart from being unreasonable or discriminational, have no special exemption from judicial determination of their legality.

Neither in the Hepburn amendment nor in the Transportation Act did Congress intend to cover ports among the localities given regulatory protection. The provision of section 3 (49 U.S.C.A. § 3), forbidding any carrier to give undue or unreasonable preference to any particular "locality" or to subject any particular "locality" to any undue or unreasonable prejudice or disadvantage, does not apply to seaports in respect of import, export, or coastwise traffic in relation to which they are in no sense points of origin or destination, but are merely gateways through which the traffic passes from rail to water carrier, and vice versa. Prior to said act of August 12, 1935, 49 U.

S.C.A. § 3(1), the commission had no authority to adjust rates on exports and imports in the interest of ports;[22] and neither at ports nor elsewhere might it have prevented a carrier from reducing rates to meet competition, merely upon the ground that the reduction would disturb the prevailing rate structure and possibly lead to a rate war between carriers.[21] Two rates may lie within the zone of reasonableness and yet involve unjust discrimination.[26] When, by reason thereof, undue prejudice results to any locality, this discrimination may be removed by order of the commission aimed directly only at the relation of rates,[27] except in the case of a port, which, as respects traffic passing through it, has no more regulatory protection than a gateway, a junction, or a way station.[28]

With these indisputable principles in mind, especially the limitations upon delegated powers of governmental agencies, let us examine the facts disclosed by the pleadings. On February 20, 1901, a contract was entered into on behalf of the United States and the Gulf & Ship Island Railroad Company for dredging a channel and anchorage basin in the Mississippi Sound. The contract authorized the payment of $150,000 for securing a specified width and depth of nineteen feet in such channel and anchorage basin. On June 14, 1906, after dredging had been in progress for about five years and the work had not been completed in accordance with the specifications, Congress adopted Joint Resolution No. 30 (34 Stat. 833, part 1), which declared it to be the intention of Congress that so much of said contract as related to securing the depth and width of said channel and anchorage basin should be

[18] Alton & S. R. R. v. United States (D.C.) 49 F.(2d) 414, 421.

[19] U. S. v. Louisville & Nashville R. Co., 235 U.S. 314, 323, 35 S.Ct. 113, 59 L.Ed. 245; U. S. v. Atchison, etc., R. Co., 234 U.S. 476, 485, 34 S.Ct. 986, 58 L.Ed. 1408.

[20] U. S. v. Illinois Cent. R. Co., 263 U. S. 515, 522, 44 S.Ct. 189, 192, 68 L.Ed. 417.

[21] U. S. v. Chicago, M., St. P. & P. R. Co., 294 U.S. 499, 506, 55 S.Ct. 462, 465, 79 L.Ed. 1023.

[22] Texas & Pacific Ry. Co. v. U. S., 289 U.S. 627, 636, 53 S.Ct. 768, 771, 77 L. Ed. 1410.

[23] Interstate Commerce Commission v. Louisville, etc., R. Co., 227 U.S. 88, 93, 33 S.Ct. 185, 57 L.Ed. 431.

[24] Texas & P. Ry. Co. v. Louisiana Oil Ref. Corp. (C.C.A.) 76 F.(2d) 465.

[25] Arizona Grocery Co. v. Atchison, etc., Ry. Co., 284 U.S. 370, 384, 52 S. Ct. 183, 184, 76 L.Ed. 348.

[26] Interstate Commerce Commission v. Baltimore & Ohio R. Co., 145 U.S. 263, 277, 12 S.Ct. 844, 36 L.Ed. 699; American Express Co. v. South Dakota ex rel. Caldwell, 244 U.S. 617, 624, 37 S.Ct. 656, 61 L.Ed. 1352.

[27] United States v. Illinois Central R. Co., 263 U.S. 515, 44 S.Ct. 189, 68 L.Ed. 417.

[28] Texas & Pacific Railway Co. v. U. S., 289 U.S. 627, 638, 53 S.Ct. 768, 772, 77 L.Ed. 1410. In this case the traffic did not move on through bills of lading, and the evidence showed that the regular steamship lines made the same rates to foreign destinations from all Gulf ports.

regarded as complied with, and authorized the payment of $150,000 therefor, provided said amount should not be paid over "until the person or persons, companies, or corporations owning or controlling docks, wharves, or terminals· in, along, or upon said basin, or connected directly or indirectly therewith, shall execute an agreement that the charges for the use of said docks, wharves, and terminals shall be such as the Secretary of War may from time to time approve." This provision was directed toward appellee, which, by legislative grant, then owned all of the land surrounding the anchorage basin and all of the wharves adjacent thereto.

On June 18, 1906, the appellee executed the contract which the resolution had stipulated should be a condition precedent to the payment of $150,000. · With reference to wharfage rates, it provides: "The said party of the first part hereby covenants and agrees with the said party of the second part that the charges for the use of the said docks, wharves and terminals connected therewith, either directly or indirectly to be made by the said party of the first part, its successors, lessees, or assigns shall be such as the Secretary of War may from time to time, forever, approve; that no tolls, wharfage fees, or dockage fees, or fees of any kind, character, or description for commodities carried over or for the use of said docks, wharves and terminals shall be placed into effect and operation until they shall have been submitted to and approved by the Secretary of War; and that these covenants shall run with the title to said premises so as to bind the successors, assignees, and lessees of the party of the first part." Upon execution of the contract, appellee was paid the money, and since that time the United States has borne the cost of maintaining the channel and anchorage basin.

On July 29, 1906, fifteen days after the approval of the joint resolution and eleven days after the execution of the covenant, the Hepburn Act was approved. Next in importance to the proximity in time of the two enactments is the fact that Congress did not incorporate in the latter any express repeal of the joint resolution, so recently passed. It provided that all laws and parts of laws in conflict therewith were repealed, · but this provision repealed "nothing which would not be equally repealed without it."[29] It added nothing to the general doctrine of repeals by implication; and I consider the real contention to be that there is an irreconcilable repugnancy which necessarily repealed the resolution and abrogated the contract.[30] I find no inconsistency in these almost contemporaneous acts of Congress. It is true that the Hepburn amendment dealt with the subject comprehensively, and conferred large powers upon the Interstate Commerce Commission, but it left a common carrier with some of its rights at common law, one of which was its right to initiate rates for transportation. It prohibited the free transportation of passengers in ordinary cases,[31] but, in the transportation of property, it did not compel the imposition of ·charges for every character of service.[32] Its charges must be reasonable and not unjustly discriminatory but, within these broad limits, it is free to exercise intelligent good faith in the management of its business. Such is not true, as to appellee, under its covenant. It has contracted away some of its corporate powers at common law, and some of its contractual powers under its legislative charter.[33]

It is not necessary for us to decide in this case whether the appellee waived a constitutional right to a fair return upon its wharfage property, but indisputably it waived a common-law right to initiate wharfage rates and put them into effect without the approval of the Secretary of War. The grant is absolute, unconditional, runs with the land "forever," and was made upon a valuable consideration. It is now claimed that "forever" terminated in eleven days and that Congress intended to throw away the valuable veto power on the initiation of intra- and interstate rates that it had purchased for the public from this corporation which had, and still has, a virtual monopoly on shipping at this port. This contention is

---

[29] Great Northern Railroad Co. v. U. S. (C.C.A.) 155 F. 945, affirmed in 208 U.S. 452, 28 S.Ct. 313, 52 L.Ed. 567. See, also, Hoague-Sprague Corporation v. Meyer Co. (D.C.) 31 F.(2d) 583.

[30] Petri v. Creelman Lumber Co., 199 U.S. 487, 26 S.Ct. 133, 50 L.Ed. 281; U. S. v. Winslow, 227 U.S. 202, 215, 33 S.Ct. 253, 57 L.Ed. 481, 485.

[31] 49 U.S.C.A. § 1 (7).

[32] Even these wharfage rates provide that no charge will be made for wharfage on ship's supplies except bunker coal.

[33] Gulf & S. I. R. Co. v. Laurel Oil & Fertilizer Co., 172 Miss. 630, 158 So. 778, 159 So. 838, 160 So. 564.

contrary to the contemporaneous construction put upon the contract by the parties for over twenty years.

Though authorized to seek the approval of the Secretary of War for the imposition of wharfage charges at any time after June 18, 1906, appellee did not do so until about June 1, 1911, when it filed a written application requesting his approval of certain charges on all commodities that might move over its wharves. A public hearing was had before a representative of the Secretary of War on July 11, 1911. The shippers resisted the imposition of any wharfage charges whatever, urging the monopoly of the harbor by the railroad company, and that the joint resolution had been repealed by the Hepburn Act, whereby jurisdiction over such rates was vested in the Interstate Commerce Commission. The appellee answered this protest, admitting its ownership of the land and wharves surrounding the harbor, and asserting that no injustice resulted from this monopoly. It further averred that the joint resolution and covenant were not repealed by the Hepburn Act, and that the exclusion of coastwise commerce from the wharfage fees did not result in any unreasonable discrimination. The Secretary of War approved the wharfage charges to the extent of 75 per cent. of the amount asked, except as to coastwise movements, which were disapproved. Thereupon, the appellee put into effect the charges as approved, and so they remained until November 20, 1928, when, without the approval of the Secretary of War, appellee filed a tariff with the Interstate Commerce Commission, in which, for the first time, it sought to collect wharfage charges on coastwise commerce.

During 1930, a complaint was filed with the Interstate Commerce Commission, attacking the reasonableness of the wharfage rates at Gulfport on lumber, poles, ties, and pilings. The rates attacked were those approved by the Secretary of War on November 10, 1911, not including coastwise traffic. The appellee challenged the jurisdiction of the commission over wharfage rates at Gulfport, maintaining that, under the joint resolution and its covenant, jurisdiction over these rates was vested solely in the Secretary of War.

On February 19, 1931, in a brief filed with the commission, appellee said:

"It was further developed that the present wharfage charges of the Gulf and Ship Island are the maximum charges which have been approved by the Secretary of War pursuant to a contract between the United States and the Gulf and Ship Island Railroad, authorized by special legislation, under which the Gulf and Ship Island agrees to publish and assess no terminal charges other than those which the Secretary of War may approve. It is the position of the Gulf and Ship Island that it is bound by this contract and that consequently any finding of the Commission in this case would be advisory only.

"Nevertheless the Gulf and Ship Island has endeavored to make a full and complete disclosure of its methods of handling the traffic and its charges therefor in order that the Commission may be in a position to make such recommendation as it may see fit; but with the distinct understanding that such presentation of facts in this case is without prejudice to the carrier's right and duty to have the matter finally passed upon by the Secretary of War after full consideration by him of all pertinent facts, including the public interest in keeping the port open and other considerations which this Commission might not take into account."

The last act of appellee prior to the filing of its pleas in this case seems to have been a denial of the jurisdiction of the commission, because, on December 31, 1934, it applied to the Secretary of War for his approval of an increase of wharfage charges on naval stores, to which application the Secretary replied, March 6, 1935, that the application would not be granted without a public hearing. So far as this record shows, from the very inception of wharfage charges until the institution of this suit, with the single exception of charges on coastwise commerce, the defendant has insisted that regulatory power is with the Secretary of War and not the commission.

I think the power is primarily with the Secretary of War, but ultimately with the commission. One is a contractual power over corporate action, the other is a regulatory governmental power; the one is a derivative power with an interest in the docks, wharves, and terminals connected with the anchorage basin; the other is a delegated power not appendant or appurtenant to any estate; the former is applicable to all wharfage; the latter only to that of an interstate character; the former is a property right which the sovereign acquired for the benefit of the public in the management of corporate business; the latter is a governmental power which the sovereign exercises over a public utility, subject to constitutional re-

strictions of due process and equal protection of law, as well as such restrictions as are inherent in our dual form of state and national government.

On behalf of the United States, the commission has never undertaken to regulate wharfage charges, except after the same had been approved by the Secretary of War, who has steadfastly maintained that no such charges could be put into effect without his approval. This is important not only to show the contemporaneous construction put upon the contract by the parties themselves, but to demonstrate the harmonious operation for many years of both legislative acts.

The railroad's present position is that the United States acquired nothing under the contract, except the governmental power of regulation, which eleven days later was transferred from the Secretary of War to the Interstate Commerce Commission. The sovereign does not need to purchase its governmental power. The Congress legislates, it does not bargain or contract, when it undertakes merely to regulate interstate commerce. The money paid under this contract was partly spent under the general welfare clause of the Constitution, and purchased an hereditament with reference to wharfage rates, founded in property, valuable in intendment of law, in the nature of a visitatorial power over the corporation itself.[34] It is in addition to the ordinary governmental powers (state and national) to regulate rates which attached to the wharfage property itself, if and when it was devoted to the public use and became vested with a public interest. Such power disposes of all controversy as to the public use of the property.

We are examining a derivative power. The joint resolution did not create it, but, by implication, simply authorized the Secretary of War to receive and exercise it. The power was created by the covenant and was derived from the corporation. It is not a naked power,[35] but is a power coupled with a trust in which the public has an interest. The distinction between it and a vested right is very shadowy and insubstantial. Being coupled with an interest in the wharfage property itself, the power is irrevocable by the donor.[36] There must be an authorized

release by the donee or an alienation by the Congress of the public interest which runs with the land and is something more than attaches to property which is vested with a public interest merely because it has been dedicated by the owner to the public use. The derivative power exercised by the Secretary of War is appendant not only to the railway terminal facilities but to all the docks and wharves of appellee. An express repeal of the joint resolution might imply a repeal of the Secretary's authority to exercise the power, and thereby extinguish it; but an implied repeal of the resolution would operate prospectively only, and would necessitate further an implied repeal of the Secretary's authority and the consequent extinguishment of the power. An inference upon an inference is not permissible, and should not be drawn to extinguish so valuable an interest purchased with public funds.

Conceding incipient validity and depending wholly on repeal by repugnancy, counsel contend that the Interstate Commerce Act, as amended by the Hepburn Act, covers the entire subject of interstate transportation by rail. "There is no gap or crevice in that Act," they say. "There is no room under that Act for the regulation of any of the charges of an interstate carrier by any tribunal other than the Interstate Commerce Commission." We do not find this to be true. Under the general law, Congress has not occupied the entire field with reference to wharfage rates permissible under its constitutional power to regulate commerce. The scope of federal regulation is broad, but it is not exhaustive.

An interstate carrier is still the manager of its own business, with definite exceptions. It may initiate rates, adopt rate policies, make a discrimination in rates (unless it is unjust), exercise a discretion within a zone of reasonableness, promulgate and file "a schedule which must be upheld unless adequate reasons are presented for setting it aside," may adust rates for export and import business below those charged for domestic traffic between the same points in order to retain traffic for its own line, may meet competition for ocean freights and not be held responsible for undue prejudice or preference to a port, and, except as indicat-

---

[34] 1 Bl.Com. 480.

[35] Williams v. Peyton's Lessee, 4 Wheat. 77, 4 L. Ed. 518; Deputron v. Young, 134 U.S. 241, 10 S.Ct. 539, 33 L. Ed. 923.

[36] Hunt v. Rousmanier's Administrators, 8 Wheat. 174, 203, 5 L.Ed. 589; Missouri ex rel. Walker v. Walker, 125 U.S. 339, 342, 8 S.Ct. 929, 31 L.Ed. 769.

ed and otherwise changed by said act of August 12, 1935, may act as a private owner in the management of its own business.[37] Under the contract, appellee may do none of these things, as to wharfage rates, without the approval of the Secretary of War.

The Interstate Commerce Commission has no jurisdiction over ocean rates. "The theory of the act is that the carriers in initiating rates may adjust them to competitive conditions, and that such action does not amount to undue discrimination; Texas & Pacific Ry. Co. v. Interstate Commerce Commission, 162 U.S. 197, 16 S.Ct. 666, 40 L.Ed. 940."[38] The charges in controversy were on lumber moving over the wharves of appellee, and were collected from the shipper. The appellee claims that they were for use of the rail carrier's terminal facilities, and subject to supervision by the Commission. This may be true, but properly wharfage charges might be assessed against the vessel and thereby shifted into the ocean rate,[39] beyond the jurisdiction of the commission as to freights not participating in the rail haul. The Congress is presumed to have had these things in mind when considering the joint resolution and the Hepburn amendment; and wharfage fees capable of such shifting may well be guarded against by a special contract in the public interest, as was done in this case.

Nothing could have worked more smoothly than these two laws. Instead of promulgating rates and filing them with the commission, on its own initiative, the appellee, in 1911, sought the approval of the Secretary of War of its wharfage charges, and filed with the commission only such as had been approved by him. When such tariffs were rightly filed, we have no doubt that the jurisdiction of the commission over them was the same as ordinarily attaches in such cases, but, when filed without the approval of the Secretary, they have no more legal effect than if filed by an agent of the railroad company acting not only beyond the scope of his authority but beyond the power of the company itself. The latter cannot take advantage of its own wrong in filing the schedule of rates without the Secretary's approval. To do so and exact the charges were both a breach of contract and a tort, and, forms of actions being abolished, appellant's demand may be regarded as either ex contractu or ex delicto.

Interstate Commerce Commission v. United States ex rel. Humboldt S. S. Co., 224 U.S. 474, 32 S.Ct. 556, 56 L.Ed. 849, strongly relied on by appellee, was a case where, as the court said, the ultimate question was "whether Alaska is a territory of the United States within the meaning of the interstate commerce act." The case is thought to be inapposite, because the act repealed was a general, not a special, one. The authority of the Secretary of the Interior was a minor one, not resting upon contract; it was merely to revise and modify rates after they had been put into effect, and it logically gave way to the broader powers from the same source and of the same nature vested in the Interstate Commerce Commission under the Hepburn Act. In the Alaskan Act (30 Stat. 409), the steamship company had received nothing and had voluntarily surrendered none of its common-law rights. Here, the broader power is with the Secretary of War. His power to approve, which implies the power to disapprove, is restrictive on corporate and not on state or federal action. His approval must be obtained in advance; it is a condition precedent to making any valid rate; it is the sine qua non of any lawful charge or collection. His authority is founded in contract, pursuant to a joint resolution which has the effect of law,[40] and need not be supported by special findings of jurisdictional facts. It operates with the freedom of ownership, because it was granted by the owner. In this respect it differs from the delegated regulatory power of the Interstate Commerce Commission, which operates in a field limited by statutory requirements, which "does not have the freedom of ownership,"[41] which, prior to August 12, 1935, was exceptionally limited at ports, which ordinarily may not be exercised to control compensatory rates which are not excessive-

---

[37] U. S. v. Chicago, M., St. P. & P. R. Co., 294 U.S. 499, 510, 55 S.Ct. 462, 467, 79 L.Ed. 1023.

[38] Texas & Pacific Ry. Co. v. U. S., 289 U.S. 627, 53 S.Ct. 768, 771, 77 L. Ed. 1410.

[39] In Parkersburg & Ohio River Transportation Co. v. Parkersburg, 107 U.S. 691, at page 698, 2 S.Ct. 732, 738, 27 L.Ed. 584, wharfage is defined as "a charge against a vessel for using or lying at a wharf or landing."

[40] United States ex rel. Levey v. Stockslager, 129 U.S. 470, 9 S.Ct. 382, 32 L.Ed. 785.

[41] Atchison, etc., Ry. Co. v. United States, 284 U.S. 248, 261, 52 S.Ct. 146, 150, 76 L.Ed. 273.

ly high, and under which an order disapproving rates initiated by the carrier is void unless supported by clear and precise findings of basic or quasi jurisdictional facts conditioning the power of the Commission.[42] The distinct powers of these two governmental agencies are carefully circumscribed within separate fields, and they can never conflict so long as the one remains within its contractual and the other within its legislative ambit.

No question of intrastate rates is involved in this case. Indeed, it is said that the directors have a contractual right, granted in the company's charter, to fix intrastate rates.[43] Therefore, it will suffice to say that there is nothing in the contractual power of the Secretary of War which is shown to be capable of being exercised in conflict with state or federal regulation. On the contrary, it is a valuable right which may be used for the protection of the public in both state and interstate matters.

It is well settled that Congress may circumscribe its regulations of interstate commerce so as to occupy only a limited field.[44] Conceding this, appellee's argument is that the purpose of the statute was to suppress every form of unreasonable discrimination which it was within the power of Congress to condemn, and that, having occupied the entire field in the later general act, the former special one was necessarily repealed. The language of some of the cases would seem to support this view.[45] For instance, in the Mottley Case, it was said that "the purpose of Congress was to cut up by the roots every form of discrimination, favoritism, and inequality." This language is limited by the facts of the case, which related to the transportation of passengers and not of property, the subject being controlled by a special statute;[46] but the authorities cited were ineffective in a later case[47] to protect the ports at Texas against destructive discriminatory rates. We are bound in this action by the construction put upon the statute in the later case, although the Chief Justice, Mr. Justice Brandeis, and Mr. Justice Cardozo concurred in a dissenting opinion by Mr. Justice Stone, and the rule was afterwards modified by statute.[48]

The farsighted wisdom of Congress in exacting a contract from appellee, almost contemporaneously with the passage of the Hepburn amendment, was demonstrated in that case, which denied the sweeping powers of the commission in the case of a port which was not the ultimate destination of the traffic. It upheld a rate structure, initiated by rail carriers, capable of diverting from one port to another ocean-borne traffic "sufficient to destroy the business of banks, marine insurance companies, freight forwarders, freight and ship brokers, stevedores, tonnage companies, pilots, dry docks, ship supply and bunker coal merchants, customs brokers, export and import commission houses."[49] The court itself, in the majority opinion, recognized the effect upon ports of prejudicial rates. It said:

"Although the shipper in the first instance consigns the commodity to the port and a separate contract is made for ocean carriage, the through rate none the less consists of the rail rate to the port, plus the ocean freight, which is the same from all Gulf ports.

"The choice of route is determined solely by the rail rates from or to the ports. If these are equalized, the shipper has an option; but, if they are disparate, the route through the port taking the higher rate is necessarily excluded. A very slight differ-

[42] Florida v. United States, 282 U.S. 194, 215, 51 S.Ct. 119, 125, 75 L.Ed. 291; United States v. Baltimore & Ohio R. Co., 293 U.S. 454, 55 S.Ct. 268, 79 L.Ed. 587; United States v. Chicago, M., St. P. & P. R. Co., 294 U.S. 499, 504, 55 S.Ct. 462, 464, 79 L.Ed. 1023.

[43] Gulf & S. I. R. Co. v. Laurel Oil & Fertilizer Co., 172 Miss. 630, 158 So. 778, 159 So. 838, 160 So. 564.

[44] Savage v. Jones, 225 U.S. 501, 32 S.Ct. 715, 56 L.Ed. 1182; Atlantic Coast Line R. Co. v. Georgia, 234 U.S. 280, 34 S.Ct. 829, 58 L.Ed. 1312; Reid v. Colorado, 187 U.S. 137, 23 S.Ct. 92, 47 L.Ed. 108; Townsend & Bernard v. Yeomans, 57 S.Ct. 842, 81 L.Ed. 1210.

[45] Merchants' Warehouse Co. v. United States, 283 U.S. 501, 512, 51 S.Ct. 505, 509, 75 L.Ed. 1227; Louisville & Nashville R. Co. v. United States, 282 U.S. 740, 749, 750, 51 S.Ct. 297, 300, 301, 75 L.Ed. 672; Louisville & Nashville R. Co. v. Mottley, 219 U.S. 467, 31 S.Ct. 265, 269, 55 L.Ed. 297, 34 L.R.A. (N.S.) 671.

[46] 49 U.S.C.A. § 1(7).

[47] Texas & Pacific Ry. Co. v. U. S., 289 U.S. 627, 53 S.Ct. 768, 780, 77 L. Ed. 1410.

[48] 49 U.S.C.A. § 3 (1), 49 Stat. 607, c. 509.

[49] Comment of Mr. Justice Stone, dissenting, in the Texas & Pacific Railway Case, supra.

ential in the rail rate, in some instances as little as a fraction of a cent per hundred pounds, will divert the traffic through the port so advantaged. The application of a distance scale to the rail rate automatically precludes shipment through the more distant port."[50]

This decision disclosed a gap in the jurisdiction of the Interstate Commerce Commission which enabled the carriers in initiating rates to deprive the Texas ports of the natural advantage of their geographical position over that of a rival port whose commercial advantages were superior, resulting in the diversion of traffic from territory to which it was normally tributary. Neither in the Hepburn amendment nor in the Transportation Act (41 Stat. 456) was the commission given the power "to circumscribe the adjustment of export and import rates by the carriers to meet competition."

There are uses for wharves not connected with commerce. A fisherman may wish to tie up his boat; a citizen may desire to reach the harbor; there is no need to multiply instances. The Congress had in mind a broad plan to meet many exigencies of a local situation, and the joint resolution was the initial step in the congressional plan to complete a project begun in 1901. The appellee was in position to exact tribute from the government and its citizens. Without these wharves, there was no practical way to reach the harbor except to go in a boat, and, without docking, to leave in a boat; there was no way to use the basin which the United States had helped to dredge and was wholly maintaining.

The joint resolution provided no definite time within which the appellee should execute its contract; therefore, a reasonable time was necessarily implied, and thirty days for the appellee to consider, prepare, and execute the contract would have been entirely reasonable. It is well known that the Hepburn amendment, which was adopted fifteen days after the approval of the joint resolution, was considered and debated in and out of Congress for a long time prior to its passage. The claim of implied repeal is based solely upon the premise that Congress by the later act occupied the entire field and crowded out the joint resolution. That premise having been proven false in the Texas & Pacific Railway Case,[51] the deduc-

tion fails, and it becomes clear that the entire field of federal regulation was not occupied by either the Hepburn amendment or the Transportation Act. To argue the contrary is to imply both that the Texas & Pacific decision was wrong and that the act of August 12, 1935,[52] was wholly redundant legislation.

Whether the joint resolution was repealed by implication by the act of August 12, 1935, is not before us, because the act was prospective in its operation and this cause of action had already vested when the 1935 act was passed. Dealing only with the case before us, it is sufficient for our present purpose that, prior to the act of 1935, Congress intended to leave rail carriers free, in certain cases, to prescribe their own rates through ports on export, import, and coastwise traffic, having first, by joint resolution and contract, taken care to provide for wharfage rates at the particular port where the United States was spending large sums on a new harbor basin and a single carrier had monopolized access thereto.

It will be helpful to inspect more closely the nature of the monopoly exercised by appellee at the Gulfport harbor when the contract was made. Under an act of the Mississippi Legislature, approved February 23, 1882 (Laws Miss. c. 542), the state had granted a special charter to the Gulf & Ship Island Railroad Company, which not only gave the directors of the corporation the right to prescribe, free from regulatory supervision, freight and passenger rates, but authorized it to reclaim and own all of the submerged land surrounding the location of the anchorage basin. This right had been so completely exercised that all of the land surrounding the basin and all of the wharves adjacent thereto were owned by the railroad company. It also owned the only line of railroad that served the harbor. Its control was so complete as to prohibit access to and use of the harbor, except over appellee's wharves. The situation is best illustrated by reference to appellee's answer, set forth in Exhibit C to the replication, which says:

"The conditions existing at the port in Gulfport are the same today as they were when this agreement was executed, on June 18, 1906 (erroneously stated June 4th): The pier is the same, the manner of handling

---

[50] Texas & Pacific Ry. Co. v. U. S., 289 U.S. 627, 635, 53 S.Ct. 768, 771, 77 L. Ed. 1410.

[51] 289 U.S. 627, 53 S.Ct. 768, 77 L. Ed. 1410.

[52] 49 U.S.C.A. § 3(1), 49 Stat. 607, c. 509.

commerce is the same, and nothing exists at the port now that did not exist at the time this agreement was made. The railroad company therefore feels that the government was in full possession of all conditions prevailing at this port when the agreement was executed, and that when the government in taking over the harbor reserved the right to pass on wharfage charges, it reserved in the premises every right deemed necessary to protect the shipping public and to guarantee to the shipping public that it would be protected at every step in the commercial life of the port."

These conditions are more completely described in its answer, wherein the appellee said: "It has a legal right, if it chooses to exercise that legal right, of purchasing, owning, and exclusively controlling one half mile on either side of the track." Further: it states that its pier is the only pier, its line of railroad the only railroad entering the harbor, but avers "that this is a fact that has been known to the War Department and to the government from the time of its original entry." In paragraph 12, it "admits that it has made no highway upon the pier for persons to reach vessels and load same through any other agency than by the use of its railroad tracks, and it states that it was never the purpose or expectation of the railroad company in making the investment that was made in providing a pier to open it to an indiscriminate, general public use."

In paragraph 13, it "expressly denies that its pier and the tracks upon its pier are a part of its general facilities or that they are a part of its regular line or terminus thereof, nor are they a part of the facilities required by law to be maintained by it as a common carrier of goods and passengers and it further denies that it owns a public wharf, but asserts the truth to be that its wharf is and has at all times been a private wharf—the private property of the G. & S. I. Railroad Company—and as such is not subject to control by the public authorities, except to the extent that the government has reserved the right through the department of war, to determine what its wharf charges shall be."

Commenting on its right to restrict the use of its wharf, the railroad company, in paragraph 22 stated: "From this wharf the railroad company has the right to exclude such boats as it desires and to this wharf the railroad company has the right to permit access by such boats as it desires. No vessel has the right to demand, by tendering compensation therefor, the use of this wharf for its own purposes." Whether these claims were sustainable is not the question.[53] This was the situation with which Congress was dealing at the time it required the specific agreement from the railroad with reference to wharfage rates, before it took over maintenance of the harbor and paid the appellee $150,000.

We have seen that the law does not favor repeals by implication; that, if repeal has been effected in this instance, it was by implication and within eleven days after Congress had exacted a contract from the appellee, that its wharfage rates would be forever subject to the approval of the Secretary of War. The language of the Hepburn Act, relied on to effect the repeal by implication, is the expression, "terminal facilities," used in describing common carriers of property subject to the terms of the act. This expression is general, not special. The words, "docks and wharves," though found in the joint resolution, are not found in the Hepburn Act. While the words, "terminal facilities," by reason of their generality may also include docks and wharves, it seems clear that Congress, considering the particular monopoly at Gulfport, meant to reserve more than ordinary control over the rates to be charged for use of the wharves. We have seen that there is no difficulty in giving effect to both the joint resolution and the Hepburn Act. The Interstate Commerce Commission and the Secretary of War, without conflict, exercised their separate powers for seventeen years before the defendant filed a conflicting tariff. Even then the commission took no affirmative action in the matter. I think the appellee, by promulgating the wharfage rates and filing the tariff, without the approval of the Secretary of War, breached its contract with the United States, which was made for the benefit of the general public, and that it is estopped to plead the existence of such tariff as a defense in this case. Since the Interstate Commerce Commission may not authorize or compel what the carrier may not lawfully do,[54] the filing of the wharfage rates in this instance was without legal effect.

[53] Galveston Wharf Co. v. Galveston, etc., Ry. Co., 285 U.S. 127, 135, 52 S.Ct. 342, 344, 76 L.Ed. 659, holding that the service of the wharf company was that of a common carrier furnishing a necessary link in the transportation under a through bill of lading.

[54] Texas & Pacific Railway Co. v.

The plea of no damage is insufficient in law, being a contradiction of a self-evident fact. It is tantamount to the proposition that the plaintiff was not injured by the tortious coercion of payments which would have been reasonable for the service rendered if the defendant had not been legally obligated to make no charge. The plea of want of equity is specious but contains the same infirmity. It overlooks the tort. It alleges that the defendant rendered the plaintiff "full and adequate consideration" for said wharfage charges and that it would be inequitable to require restitution for the sole reason that said charges were not approved by the Secretary of War. There are a number of these pleas. All of them seek refuge in the filing of the schedules with the commission. To these pleas, a long replication was filed by the plaintiff extensively setting forth the facts in detail. We have seen that a demurrer was sustained to this replication, and the court's action on that demurrer is the matter under review. The demurrer, of course, admits the execution of the covenant in pursuance of the joint resolution, the payment and acceptance of the consideration, and all other well-pleaded facts in the replication. Extending the demurrer back to the pleas of no damage and want of equity, we have the legal contention of appellee boldly revealed. It is that the wrongful filing of an unauthorized tariff cuts off judicial inquiry, except by the Interstate Commerce Commission, as to the lawfulness of the charges collected under it. We understand this rule applies where the claim is based upon an unreasonable or excessive rate under a tariff duly filed, and we perceive the reason for the rule to be, that such claim involves a question of fact and requires investigation by an administrative agency especially equipped to inquire into and find the facts. The shipper in this case is not seeking reparation upon the unreasonableness of an established rate,[55] but is seeking damages for the wrongful establishment and exaction of an unlawful rate; damages for a tort.

At common law the carrier had the right to fix and exact rates but "took its chances that in an action by the shipper these might be adjudged unreasonable and reparation be awarded."[56] The Interstate Commerce Act, as amended (49 U.S.C.A. § 1 et seq.), "altered the common law by lodging in the Commission the power theretofore exercised by courts, of determining the reasonableness of a published rate." It did not take away the common-law remedy of the shipper to sue the carrier for damages, in contract or in tort, upon a claim not involving an issue of fact but arising solely upon the construction of federal statutes. A statute in derogation of this common law right must be strictly construed. Wherever the Transportation Act deals with the subject (except as to the reasonableness of rates), it undertakes to preserve rather than to destroy the right of the shipper to sue.[57]

If the joint resolution and contract remain in effect, it is immaterial whether the carrier knew the law and fraudulently incorporated the controverted charges in its published tariffs, without the approval of the Secretary, for the purpose of obtaining an unfair advantage over the shipping public, for whose benefit the contract was made; or whether, being honestly mistaken as to its legal rights, it filed the schedules and collected the charges in violation of its solemn agreement under the joint resolution. The appellee knew that the Secretary of War had disapproved the proposed rates, and it wilfully filed the tariffs in defiance of his disapproval. Probably it should not be censured for this, and I do not intend these remarks as censure, because that may have been the best way to raise the legal question as to the repeal of the joint resolution and the abrogation of the contract. However, while it should not be criticized, it does not deserve to be rewarded for breaching its contract or committing a tort, and that would be the effect of sustaining the equitable plea. The plea itself is predicated upon the proposition that, notwithstanding the validity of the contract and the requirement of the Secretary's approval, the charges are reasonable and the appellant is without remedy, except to apply to the commission to determine not the reasonableness of the rates but its own jurisdiction over them. Under the statute, the person damaged has his election, but may not pursue both remedies for a money demand.[58]

To admit that the joint resolution is not repealed, that the contract is still in effect

United States, 289 U.S. 627, 637, 53 S. Ct. 768, 771, 77 L.Ed. 1410.

[55] Texas & Pacific Railway Co. v. Abilene Cotton Oil Co., 204 U.S. 426, 27 S.Ct. 350, 51 L.Ed. 553, 9 Ann.Cas. 1075.

[56] Arizona Grocery Co. v. Atchison, etc., Ry. Co., 284 U.S. 370, 383, 52 S.Ct. 183, 184, 76 L.Ed. 348.

[57] 49 U.S.C.A. §§ 8, 9.

[58] 49 U.S.C.A. § 9.

and was breached by the wrongful exaction of unlawful rates, or that a tort was committed, and yet to deny relief merely because the statute says that no carrier shall remit or refund any portion of its published rates,[59] would put us behind the Bolognian law, that whoever drew blood in the streets should be punished, which was held "after long debate" not to extend to the surgeon who opened the vein of a person who fell down in the street with a fit.

"This stringent rule prevails," counsel says, "because otherwise the paramount purpose of Congress—prevention of unjust discrimination—might be defeated." The argument is advanced in behalf of the pleas of no damage and want of equity but ignores the import of these pleas, which is that the joint resolution is still in effect and the contract unimpaired, and it gives no weight to the paramount purpose of Congress as expressed in the joint resolution which required a contract from appellee that the wharfage rates should be such as the Secretary of War should forever approve.

The Transportation Act was designed to prevent evasion of the rule that every charge for transportation shall be just as well as reasonable. The collection by a common carrier of exorbitant charges is a tort, and, where two or more carriers combine to impose excessive charges over their connecting lines, the general rule as to liability of joint tort-feasors applies.[60]

"Defendant is liable for any violation of the act by it that caused or contributed to cause damage to plaintiff without regard to the proportion of the charges attributable to the foreign transportation or paid to the foreign carrier. News Syndicate Co. v. New York Cent. R. Co., supra, 275 U.S. 179, 187, 188, 48 S.Ct. 39, 72 L.Ed. 225.

"The act does not create a cause of action based on the Commission's findings and reparation order for the recovery of money collected as freight charges based on rates alleged to be unjust and unreasonable. It makes a determination by the Commission of the unreasonableness of the rate attacked and the extent that it is, if at all excessive, a condition precedent to suit. * * * But no action for damages alleged to have been caused by the exaction of excessive rates for interstate transportation can be main-tained in any court, state or federal, in the absence of a prior finding by the Commission that the rate charged was unreasonable. The reasons upon which this rule rests have been fully stated in our decisions. Texas & Pac. Ry. Co. v. Abilene Cotton Oil Co., 204 U.S. 426, 444, 27 S.Ct. 350, 51 L.Ed. 553, 9 Ann.Cas. 1075; Robinson v. Baltimore & Ohio R. Co., 222 U.S. 506, 510, 32 S.Ct. 114, 56 L.Ed. 288. Cf. Baltimore & Ohio R. Co. v. United States ex rel. Pitcairn Coal Co., 215 U.S. 481, 498, 30 S.Ct. 164, 54 L.Ed. 292; Great Northern Ry. Co. v. Merchants' Elev. Co., 259 U.S. 285, 291 [292], 298, 42 S.Ct. 477, 66 L.Ed. 943."

An examination of these cases will show the reason to be that a reasonable rate is a question of fact with respect to which different conclusions reasonably may be drawn by separate fact-finding tribunals. The reason for the rule ceases where only a question of law is involved. It will be noted that "the act does not create a cause of action" based on the commission's findings and order of reparation where rates are alleged to be unjust and unreasonable, and that it only makes a determination by the commission of "the unreasonableness of the rate attacked and the extent that it is, if at all excessive, a condition precedent to suit." If the act does not "create a cause of action" based upon unreasonable rates, it leaves the common law cause of action unimpaired except as to the condition precedent mentioned. There is no such condition precedent as to an unlawful rate, where no factual issue of unreasonableness is involved. "In other words," as Mr. Justice Roberts says, "the legal rate was not made by the statute a lawful rate—it was lawful only if it was reasonable. Under section 6 [49 U.S.C.A. § 6], the shipper was bound to pay the legal rate; but, if he could show that it was unreasonable, he might recover reparation."[61] We do not need the Commission's findings that a wharfage charge is unreasonable or exorbitant if under a joint resolution of Congress no charge whatever is lawful. To paraphrase the language just quoted: Under the Transportation Act, the shipper is bound to pay the prima facie legal rate, but if he can show that it is unlawful under an act of Congress he may recover damages in the proper court, provided there is no issue of fact to be decided by the commission as a

---

[59] 49 U.S.C.A. § 6(1, 7).

[60] Lewis-Simas-Jones Co. v. Southern Pacific Co., 283 U.S. 654, 660, 51 S.Ct. 592, 595. 75 L.Ed. 1333.

[61] Arizona Grocery Co. v. Atchison, Topeka & Santa Fé Ry. Co. et al., 284 U.S. 370, 384, 52 S.Ct. 183, 184, 76 L.Ed. 348.

124

condition precedent to the suit. In the main, this case depends upon the intent of Congress as expressed in the Hepburn amendment, and there is no proper issue for submission to the Interstate Commerce Commission, since the reasonableness of the rates is immaterial, and the extent of exorbitancy is also immaterial.

It must be conceded that the right to recover an unreasonable or unlawful charge exacted by a common carrier exists at common law unless abrogated by federal statute.[62] The case just cited holds that this right has been subjected to a condition precedent requiring a reparation order so far as unreasonable rates are concerned, but in that case it was "conceded that the act to regulate commerce did not in so many words, abrogate such right" (204 U.S. 426, at page 436, 27 S.Ct. 350, 353, 51 L.Ed. 553, 9 Ann. Cas. 1075), and the court said: "It follows that the contention that the right was taken away by the act to regulate commerce rests upon the proposition that such result was accomplished by implication. In testing the correctness of this proposition we concede that we must be guided by the principle that repeals by implication are not favored, and, indeed, that a statute will not be construed as taking away a common-law right existing at the date of its enactment, unless that result is imperatively required; that is to say, unless it be found that the pre-existing right is so repugnant to the statute that the survival of such right would in effect deprive the subsequent statute of its efficacy; in other words, render its provisions nugatory."

We have then in this case the question: Whether, by implication, the common law right of a shipper to sue a common carrier for breach of contract or tort, arising out of the exaction of a wholly unwarranted charge, has been subjected to a similar condition precedent when no issue of fact is involved. Since, by implication, "a statute will not be construed as taking away a common law right existing at the date of its enactment, unless that result is imperatively required," I answer that question in the negative. I do not find that the pre-existing right to recover a wholly unlawful charge without preliminary resort to the commission is so repugnant to the Interstate Commerce Act as to render the right null and void. In

Great Northern Ry. Co. v. Merchants' Elevator Co., 259 U.S. 285, 42 S.Ct. 477, 66 L.Ed. 943, the court held that a shipper may recover charges exacted by a carrier under an interstate tariff involving no question of fact, either in aid of construction or in other respect, and no question of administrative discretion. In a note (259 U.S. 285, at page 295, 42 S.Ct. 477, 480, 66 L.Ed. 943, 948), the cases are collated in which the jurisdiction of the court was sustained, without preliminary resort to the commission, where "the question involved was solely one of construction of a tariff, or otherwise a question of law, and not one of administrative discretion"; and also the cases where the court refused to take jurisdiction, because there had not been a preliminary resort to the commission, wherein "the question presented either was one of fact or called for the exercise of administrative discretion." The court distinguished Texas & Pacific Ry. Co. v. American Tie & Timber Co., 234 U.S. 138, 34 S.Ct. 885, 58 L.Ed. 1255, Loomis v. Lehigh Valley R. Co., 240 U.S. 43, 36 S.Ct. 228, 60 L.Ed. 517, and other cases.

The unanimous opinion of the court in the Great Northern Railway Case seems to answer conclusively the contention that appellant should be denied relief in the courts, because of a condition precedent upon its common law remedy, arising by implication from the Hepburn amendment and abrogating the shipper's right to sue the carrier for damages caused by the exaction of wholly unlawful charges, not based upon the unreasonableness thereof and not involving any issue of fact or any question of administrative discretion; but involving solely a question of law, depending upon the intent of Congress in the passage of a joint resolution and the subsequent enactment of said amendment. Conceding that uniformity is the paramount purpose of the Interstate Commerce Act, as amended (49 U.S.C.A. § 1 et seq.), the court held it to be not true in all cases that uniformity can be obtained only through a preliminary resort to the Commission. Such preliminary resort is required only in two classes of cases and only because the "inquiry is essentially one of fact and of discretion in technical matters.[63] * * * In the case at bar the situation is entirely different from that presented in

[62] Texas & Pacific Railway Co. v. Abilene Cotton Oil Co., 204 U.S. 426, 27 S.Ct. 350, 51 L.Ed. 553, 9 Ann.Cas. 1075.

[63] 259 U.S. 285, 291, 42 S.Ct. 477, 479, 66 L.Ed. 943.

the American Tie & Timber Co. Case, or in the Loomis Case. Here no fact, evidential or ultimate, is in controversy, and there is no occasion for the exercise of administrative discretion."[64] The opinion closes with an admonition to counsel to bear in mind the distinction "between controversies which involve only questions of law and those which involve issues essentially of fact or call for the exercise of administrative discretion."[65]

A recent case in point is Brown & Sons Lumber Company v. Louisville & N. R. Co., 299 U.S. 393, 57 S.Ct. 265, 81 L.Ed. 301, wherein the court gave a signal application to the rule that a shipper, whose claim for overcharges depends solely upon the non-technical, unambiguous language of a tariff, may sue at law without first applying to the commission for a reparation order. The fact that the carriers, in an earlier proceeding before the commission, had sought unsuccessfully to have the rule modified so as to overcome the interpretation given it by the commission, and were thus left remediless by administrative action, was held not to estop them from insisting in the courts upon the construction for which they had unsuccessfully contended before the commission.

Early in the history of this government, the sanctity of a contract between the sovereign and a corporation was upheld in a famous case which has never been overruled and which has had much to do with the development of corporate business in this country. In the case at bar, the attitude of the parties is reversed. The corporation is the one sought to be bound. The citizen is invoking the provisions of a contract made by the sovereign for its benefit. It is a valuable contract and should not be obliterated by implication upon an implication.

Legislation should take effect at a definite date. If there was an implied repeal of the joint resolution, the date of its consummation is uncertain and, with varying plausibility, may range from the Hepburn Act of 1906, through the Transportation Act of 1920, down to the port-discrimination act of 1935. If the field of interstate regulation was fully occupied in 1906, if there was then "no gap or crevice in that act," if there was no longer need for a power which operates with the freedom of ownership, where was the room for the act of 1920, and why the necessity for the act of 1935?

There may come a time when the field of federal regulation will be exercised sufficiently for the Congress to release the corporate power purchased under authority of the joint resolution, but the release should come from it by express legislation, or by an implication so strong as to admit of no doubt of the date when the intention of Congress was formed. An intention that may or may not have been reached in 1906, 1920, or 1935 is too vague and indefinite for the business of carrier and shipper alike.

The agreement of counsel with reference to the filing of tariffs with the Interstate Commerce Commission was merely for the purpose of abbreviating the record. The court cannot be controlled by an agreement of counsel on a question of law. Swift & Co. v. Hocking Valley Railway Company, 243 U. S. 281, 37 S.Ct. 287, 61 L.Ed. 722.

For the reasons above stated, I respectfully dissent in this case.

---

[64] 259 U.S. 285, 294, 42 S.Ct. 477, 480, 66 L.Ed. 943.

[65] 259 U.S. 285, 295, 296, 42 S.Ct. 477, 480, 66 L.Ed. 943.